## STATE OF CONNECTICUT *v.* EDWARD DOUGLAS
### (12945)

PETERS, C. J., HEALEY, SANTANIELLO, CALLAHAN and HULL, Js.

Argued March 3—decision released May 5, 1987

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Harry Weller,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Warren Maxwell,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Edward Douglas, was charged in an information with attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49[1] and 53a-134 (a) (4).[2] The charges arose

[1] "[General Statutes] Sec. 53a-49. CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a), it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[2] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom,

from the attempt of a lone black male to rob the South Green branch of the Connecticut National Bank in Hartford on May 1, 1984. The defendant pleaded not guilty to the charge, electing a jury trial. On April 26, 1985, he was found guilty as charged, and was subsequently sentenced by the trial court to a two year term of imprisonment, the execution of which was suspended, and he was placed on probation for two years and ordered to perform 400 hours of community service. The defendant's motion for a new trial was denied, and he thereafter filed an appeal to the Appellate Court which was later transferred to this court pursuant to Practice Book § 3004A[3] (now § 4023).

On appeal, the defendant claims that the trial court: (1) erred in ruling that he could not present the expert opinion testimony of a physical anthropologist who analyzed photographs taken by the bank's surveillance cameras; (2) erred in excluding from evidence photographic exhibits, prepared by the expert witness, which

---

he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[3] Practice Book § 3004A (now § 4023) provides: "The supreme court may transfer to itself a cause in the appellate court. Except for any matter brought pursuant to its original jurisdiction under the constitution, the supreme court may transfer a cause or class of causes from itself, including any cause or class of causes pending on July 1, 1983, to the appellate court. The court to which a cause is transferred has jurisdiction.

"There shall be no fee on such transfer. The chief clerk of the supreme court shall notify all parties and the clerk of the trial court that the appeal has been transferred. A case so transferred shall be entered upon the docket of the court to which it has been transferred and the chief clerk shall require the parties to take such steps as may be necessary to make the appeal conform to the rules of the court to which it has been transferred."

juxtaposed photographs of the defendant with the surveillance photographs; and (3) violated his federal[4] and state[5] constitutional rights to present a defense. We find no error.

I

The only contested issue at trial was identification. The facts relevant to this issue are as follows: Employees of the South Green branch of the Connecticut National Bank testified that the robber entered the bank shortly before the 3 p.m. closing time. He requested information from two tellers, both of whom directed him to a customer service representative. After talking briefly to the customer service representative, the robber returned to the teller to whom he had initially spoken and handed him a note, requesting $12,000 in one hundred dollar bills. The note also threatened that the robber had a gun and that he would start shooting if an alarm were activated. The teller told the robber that

[4] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

[5] Article first, § 8, of the Connecticut constitution provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

he could not comply with his request because "he did not have that kind of money." The robber persisted, but eventually left the bank empty-handed without further incident.

During the robbery attempt, the bank's surveillance cameras continually took photographs of the robber while he was at the teller's window. During the investigation of the robbery, the negatives from the surveillance cameras were turned over to the authorities and developed. As a result, shortly thereafter, the defendant was identified, apprehended, and arrested.

At the trial, three tellers and the customer service representative, all of whom were working in the bank the afternoon of the robbery, testified as part of the state's case-in-chief. The two tellers who had spoken to the robber each made in-court identifications of the defendant. The other teller and the customer service representative testified as to what had occurred, but they could not identify the defendant at trial. The state also introduced into evidence several photographs of the robber that had been taken by the bank's surveillance cameras the afternoon of the attempted robbery. Subsequent to the introduction of the surveillance photographs, the state called six acquaintances of the defendant to testify, all of whom identified him as the person depicted in the bank surveillance photographs. Among the witnesses were his former girl friend and her mother, with whom the defendant had been residing at the time of the attempted robbery. In his defense, the accused proffered an alibi and testified that he was not the person depicted in the surveillance photographs. He also called to testify his mother, his current roommate and two acquaintances, all of whom opined that the defendant was not the man shown in the surveillance photographs.

The defendant then attempted to have qualified as an expert witness on the issue of identification, Alan

Mann, a "physical anthropologist." Mann was an associate professor of anthropology at the University of Pennsylvania, where he taught biological anthropology. He also had been, for almost ten years, a consulting forensic anthropologist for the medical examiner in Philadelphia, specializing in the examination and identification of fragmentary human skeletal remains. A primary area of Mann's research, study and expertise was, in his words, "those minor differences in nose shape, in shape of skeletal features and features that might be minor but, in essence, distinguish us all as individuals and different from anybody else."

At a lengthy hearing outside the presence of the jury, the defendant made an offer of proof concerning the admissibility of Mann's testimony. See *State* v. *Conrod,* 198 Conn. 592, 597, 504 A.2d 494 (1986). At the outset of that hearing, defense counsel informed the trial court that Mann had recently taken photographs of the defendant, that he would compare the photographs he had taken with the bank surveillance photographs and point out "certain distinctions" between the persons depicted. Defense counsel also told the trial court that Mann would express an opinion that the defendant was not the person shown in the bank surveillance photographs.

At the hearing, Mann testified as to the methodology he had used to photograph the defendant and said he believed his methods enabled him to duplicate, as nearly as possible, the conditions under which the surveillance photographs had been taken. He stated that to obtain that result he had gone to the branch bank where the crime had occurred and had observed the lighting, photographed the interior, calculated the angles of the surveillance cameras, and measured the distance between the surveillance cameras and the location where the robber had stood. He further testified that, thereafter, at another location, he had the defend-

ant assume, as closely as possible, the various positions of the person shown in the bank surveillance photographs. He then took a number of photographs of the defendant from, what he determined to be, the angle and distance of the surveillance cameras. After cropping some of the photographs he had taken, and juxtaposing them with the surveillance photographs, he secured them with tape, and compared and analyzed them as to minute physical features: "the shape of his mouth, the size and extent of his nasal area, the shape and size of his jaw area, the size of his brow arches." As a result of his examination of the photographs, Mann testified that he was convinced the defendant was not the individual depicted in the bank surveillance photographs, and that he could render an opinion to that effect with reasonable scientific certainty. The state objected.

It was brought out during the hearing that the bank surveillance photographs had been taken under fluorescent lighting with a 16mm camera, while Mann's comparison photographs were taken outside in natural light using a 35mm camera with a 50mm lens. It was further revealed that, when Mann measured the angle of the surveillance cameras, he had assumed the cameras had not been moved since the date of the robbery because they were bolted to the wall; he did not, however, have any direct knowledge to that effect. Also, Mann was not aware of the make of the lens or the quality of film used in the surveillance cameras. On being questioned by the trial court, Mann conceded that in taking photographs of a subject, for the purpose of comparing minute physical features with those of a subject depicted in an existing photograph, differences in the type of camera and lens used, the quality of film, the position of the subject, lighting conditions and camera angle are all variables which could affect his ability to make an accurate comparison.

At the conclusion of the hearing, the trial court ruled that neither Mann's opinion nor the photographs he had taken and juxtaposed with the surveillance photographs were admissible in evidence. It based its ruling primarily on two factors: that it had not been established that the two sets of photographs had been taken under substantially similar conditions, and that an expertise in photography, which Mann did not possess, was required for the comparison and analysis of the photographs. We agree.

"The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. *State* v. *Girolamo,* 197 Conn. 201, 214, 496 A.2d 948 (1985); *State* v. *Biller,* 190 Conn. 594, 617, 462 A.2d 987 (1983)." *State* v. *Kemp,* 199 Conn. 473, 476, 507 A.2d 1387 (1986). The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. *State* v. *Palmer,* 196 Conn. 157, 166, 491 A.2d 1075 (1985); *State* v. *Asherman,* 193 Conn. 695, 716, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Biller,* supra; *State* v. *Wilson,* 180 Conn. 481, 489–90, 429 A.2d 931 (1980); *Going* v. *Pagani,* 172 Conn 29, 35, 372 A.2d 516 (1976); *State* v. *Elliott,* 8 Conn. App. 566, 572, 513 A.2d 1285, cert. denied, 201 Conn. 813, 517 A.2d 630 (1986). "In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." *State* v. *Asherman,* supra. The essential facts on which an expert opinion is based are an important consideration in determining the admissibility of his opinion. See *Berndston* v. *Annino,* 177 Conn. 41, 46, 411 A.2d 36 (1979); *Sears* v. *Curtis,* 147 Conn. 311, 314–15, 160 A.2d 742 (1960). "Where the factual basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated

are such as to make an opinion based on them without substantial value." *State* v. *Asherman,* supra, 716–17. That question is one of fact for the trial court. *Liskiewicz* v. *LeBlanc,* 5 Conn. App. 136, 141, 497 A.2d 86 (1985).

It is manifest that there was a good deal of variation between the conditions under which Mann photographed the defendant and those under which the bank surveillance photographs were taken. Mann testified, however, that he had recreated the bank conditions as nearly as possible and that any differences were inconsequential or compensated for and would not affect his ability to render a valid opinion. The trial court was not required to, nor obviously did it, credit Mann's testimony in that regard. See *New Haven Savings Bank* v. *West Haven Sound Development,* 190 Conn. 60, 69, 459 A.2d 999 (1983).

Furthermore, in order to be admissible, the proffered expert's knowledge must be directly applicable to the matter specifically in issue. *State* v. *Biller,* supra; *Going* v. *Pagani,* supra; *Siladi* v. *McNamara,* 164 Conn. 510, 513–14, 325 A.2d 277 (1973). Although Mann testified that he had taken two courses in photography as a graduate student, used photography in his work and taught a course in scientific photography, the trial court was not compelled to conclude that he possessed the requisite expertise to compare and analyze the two sets of photographs. In explaining its ruling in this regard the trial court stated, "[e]ssentially, the expertise that we're talking about that is required for that type of analysis is not necessarily that of an anthropologist. In fact, the expertise that is required is a person who is an expert in photography, photography analysis, et cetera. Those qualifications, of course . . . have not been met."

We cannot conclude, therefore, that the trial court abused its wide discretion or misconstrued the law

when it determined that the different conditions under which Mann took the photographs, for comparison with the surveillance photographs, provided a flawed predicate for his opinion. Nor can we conclude that the trial court abused the wide discretion accorded it in evaluating the qualifications of an expert witness when it found that Mann, although an expert in anthropology, lacked the requisite expertise in photography to analyze the allegedly minute distinctions in physical features in the two sets of photographs. See *Sears* v. *Curtis,* supra, 314.

## II

The defendant next claims that even if Mann's opinion was inadmissible the trial court erred when it excluded the exhibits Mann had prepared. These exhibits juxtaposed the photographs he had taken of the defendant with those taken by the bank surveillance cameras. The purpose of the defendant's offer was to allow the jury to compare the photographs side by side and to examine the images depicted therein for dissimilarities. The trial court ruled that, because they were taken under different conditions, to allow Mann's photographs to be presented in such a fashion would be "misleading" and "prejudicial" to the state. We agree. Whether photographs "show proportions and relations sufficiently to be of value as evidence in the trial of a cause, is a preliminary question to be decided by the court, and as to which its decision can rarely be reviewed." *Harris* v. *Ansonia,* 73 Conn. 359, 364, 47 A. 672 (1900); *Livingstone* v. *New Haven,* 125 Conn. 123, 128, 3 A.2d 836 (1939); *Voltz* v. *Orange Volunteer Fire Assn., Inc.,* 118 Conn. 307, 311–12, 172 A.2d 220 (1934).

## III

The defendant finally claims that the rulings of the trial court excluding Mann's opinion and the juxtaposed

photographs deprived him of his federal and state constitutional rights to obtain and present witnesses to establish a defense. We disagree. Not every evidentiary ruling adverse to a defendant is constitutional error. *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985). The defendant has put a constitutional tag on a nonconstitutional evidentiary ruling. See *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982). The right to call witnesses in his defense does not give the defendant the right to present any witness' testimony or evidence he chooses. In the exercise of his sixth amendment right to compulsory process "the accused, as required of the State, must comply with the established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers* v. *Mississippi,* 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State* v. *Kemp,* 199 Conn. 473, 479, 507 A.2d 1387 (1986).

There is no error.

In this opinion the other justices concurred.

