**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald L. PAGEL,**
**Defendant–Appellant.**

**No. 87–2703.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1988.

Decided Aug. 16, 1988.

Glenn C. Reynolds, O'Brien & Reynolds, Madison, Wis., for defendant-appellant.

Jeffrey M. Anderson, Asst. U.S. Atty., John R. Byrnes, U.S. Atty., U.S. Atty's Office, Madison, Wis., for plaintiff-appellee.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and PELL, Senior Circuit Judges.

BAUER, Chief Judge.

Ronald Pagel appeals from his conviction for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). He argues that certain evidence discovered in the search of a vehicle he was driving should have been suppressed at trial because the search violated his Fourth Amendment rights, and that the trial court erred in refusing to admit certain of his proffered evidence at trial. We reject both arguments and affirm his conviction.

## I.

### A.

In the spring of 1987, Detective Thomas Kretschman of the Dane County, Wisconsin Sheriff's Department was investigating a burglary that had occurred in Verona, Wisconsin. During the course of his investigation, he interviewed two people who had overheard two men talking in a Verona tavern about the burglary. He also learned that a parolee named Wade Larsen was living in a motel in Verona. Kretschman decided to see if Larsen matched the description of either of the men the interviewees had overheard at the Verona tavern.

Kretschman called Officer Ensloe of the Verona Police Department, who happened to live at the same motel. Ensloe told Kretschman that another motel resident, Robert Jacobson, had recently observed Larsen with a handgun. Kretschman contacted the manager of the motel, a Mr. Krueger, who stated that he had heard gunshots from the area of Larsen's apartment, and that other residents had complained of shots. Krueger also told Kretschman that Larsen had told him that he kept a gun in his room and that he had fired it on occasion. Kretschman then contacted Jacobson, who told him that on April 12, 1987, he saw Larsen drive into the motel parking lot in a 1973 Oldsmobile. Jacobson said he saw Larsen get out of the car, go into the motel, and return to the car carrying a .25 or .32 caliber handgun. According to Jacobson, Larsen put the gun in his pocket and hurriedly drove away.

Sensing a potential parole violation, Kretschman called Larsen's parole agent, Neil Lane, and told him of Larsen's possible possession of a handgun. Lane decided to search for the gun during a scheduled home visit with Larsen the next day, and asked Kretschman to accompany him and,

if necessary, assist him in handling Larsen. Lane then told his supervisor, Kristine Flood, about Kretschman's information concerning Larsen and asked for permission to search Larsen's home pursuant to Wis.Admin.Code, HSS § 328.21(c), which provides that "[a] search of a client's living quarters or property may be conducted by field staff if there are reasonable grounds to believe that the quarters or property contain contraband. Approval of the supervisor shall be obtained unless exigent circumstances, such as suspicion the parolee will destroy contraband or use a weapon, require search without approval."[1] Pursuant to the regulation, Flood gave Lane verbal authorization to search Larsen's residence.

The next day, at approximately 5:15 p.m., Lane met Kretschman and a Detective Hughes at Larsen's motel in Verona. While the detectives waited in their car, Lane knocked on Larsen's door. No one answered. Soon after, Kretschman saw Larsen walking toward the motel. When Kretschman got out of his car, Larsen turned around, walked around the side of the motel, and disappeared. After a brief search of the area, the detectives and Lane returned to Larsen's apartment, where Larsen reappeared a short time later. Lane then told Larsen that he was going to search Larsen's apartment because he had information that Larsen had a gun and was a robbery suspect. Larsen voiced no objection.

When the group entered Larsen's living area, Larsen said something like, "You're probably thinking of this," and picked up a plastic pellet gun from a nearby stand.

When Kretschman took the plastic gun and showed it to Jacobson, however, Jacobson said it was definitely not the same gun he had seen two days before. Lane then expanded his search to Larsen's kitchen and bedroom, looking for the gun described by Jacobson. In the bedroom, Lane lifted a mattress and found a loaded .38 caliber revolver with a package of cartridges. Lane gave the gun to Kretschman, who unloaded it and showed it to Jacobson. But Jacobson said it, too, was definitely not the gun he had previously observed. At that point, Larsen was taken into custody for a parole violation and the apartment search ended.

While the apartment search was in progress, Dane County Deputy Norbert Peter Endres arrived at the scene to see if the detectives needed assistance. Kretschman told Endres to look for Larsen's 1973 Oldsmobile and suggested that Endres talk to Jacobson for a more detailed description of the car. Jacobson described Larsen's vehicle to Endres as a gold Oldsmobile Cutlass Supreme with a brown top, license number AHE–511. A short time later, Jacobson told the officers he had just seen Larsen's car driving past the motel. The officers then passed this information on to Lane, who by now had discovered the .38 caliber revolver beneath the mattress in Larsen's bedroom. Lane requested the officers to stop Larsen's car so it could be searched and, at the direction of either Kretschman or Hughes, Endres went off to stop Larsen's car. Endres was not instructed to arrest the driver, nor did he know the reason for stopping Larsen's car;

---

1. That regulation provides further that

... In deciding whether there are reasonable grounds to believe that a client possesses contraband or that a client's living quarters or property contain contraband, a staff member shall consider:

(a) The observations of staff members;

(b) Information provided by informants;

(c) The reliability of the information relied on. In evaluating reliability, attention shall be given to whether the information is detailed and consistent and whether it is corroborated;

(d) The reliability of the informant. In evaluating reliability, attention shall be given to whether the informant has supplied reliable information in the past and whether the informant has reason to supply inaccurate information;

(e) The activity of the client that relates to whether the client might possess contraband;

(f) Information provided by the client that is relevant to whether the client possesses contraband;

(g) The experience of a staff member with that client or in a similar circumstance;

(h) Prior seizures of contraband from the client; and

(i) The need to verify compliance with rules of supervision and state and federal law.

he only knew that a question of a weapon was involved.

After driving a few miles in the direction toward which Jacobson saw the Oldsmobile heading, Endres spotted Larsen's car and activated his warning lights. Pagel was driving. Instead of stopping on the side of the road, however, Pagel drove the Oldsmobile into the parking lot of an apartment complex and parked in a stall directly in front of one of the apartments. Endres pulled up right behind and perpendicular to the vehicle, and contacted Hughes and Kretschman, who were still back at the motel. Hughes told Endres to get the driver out of the Oldsmobile and to detain him until the detectives could speak with him. Lane then left for the apartment complex in his own car. Detective Hughes followed in an unmarked car, with Kretschman and a handcuffed Larsen in the back seat.

After stopping behind the Oldsmobile, Endres got out of his car carefully. According to Endres, at the same time, Pagel also got out of the Oldsmobile in an "unusual manner"—stooped over with his back to Endres, then slowly turning and standing upright to face Endres. Endres ordered Pagel to come toward him and, near the trunk of the Oldsmobile, performed a pat-down search. Finding no weapons, Endres placed Pagel in the back of the squad car. The only verbal exchange initiated by Endres took place when Endres asked Pagel what he was doing at the apartment complex and Pagel responded that he was visiting a friend.

A short time later, Lane, Hughes, and Kretschman arrived. Lane obtained the keys from Pagel and searched the Oldsmobile's interior, then the trunk, in which he discovered two cartons containing drug paraphernalia. This discovery prompted Lane to turn to Hughes and Kretschman for advice, who suggested that the car be seized and a search warrant for the trunk obtained. Lane then completed the search for a weapon, but none was found.

While Lane was searching Larsen's vehicle, a woman standing on a second-floor balcony some thirty feet from the Oldsmobile directed the officers' attention to a

small white package under a car parked next to and about three or four feet from the Oldsmobile. Lane picked up the package and gave it to Kretschman, who determined that it was cocaine. Kretschman then walked over to Endres's squad car and placed Pagel under arrest.

### B.

On April 15, 1987, Pagel was charged by complaint with possession with intent to distribute the cocaine found at the scene of his arrest in violation of 21 U.S.C. § 841(a)(1). A few days later, the grand jury handed down a superseding indictment for the same offense.

Before trial, Pagel moved to suppress the fruits of what he alleged was an unlawful stop and search, including his statement to Deputy Endres and the drug paraphernalia discovered in the Oldsmobile. In addition, Pagel sought to suppress at trial his identification, which, he alleged, also was obtained as a result of his unlawful arrest. After an evidentiary hearing, the magistrate concluded that the stop and search of the Oldsmobile was constitutional as a legitimate parolee search, but that, after Pagel was pat-searched and placed in the back of Endres's squad car, he was effectively arrested and, because there was no probable cause for an arrest, it was unlawful. The district court agreed. It held that because the search of the Oldsmobile was lawful pursuant to Wis.Admin.Code, HSS § 328.21(3), stopping Pagel was a necessary step in effecting that search, and it therefore refused to suppress the evidence obtained from the search of the car. The court also refused to suppress Pagel's identification, finding that, because Kretschman had identified Pagel from prior contacts, the identification had an "independent source." Based upon the unlawful arrest, however, the court suppressed Pagel's statements.

Pagel's trial lasted less than two days. Pagel neither testified nor produced any witnesses after the government rested. During the government's case, however, he did produce photographs of the scene of his arrest taken several days after the inci-

dent. The photographs purported to portray the positions of Larsen's Oldsmobile and the car next to it, under which the package of cocaine was found. The defense sought to show that, given the relative positions of Pagel, Endres, and the two vehicles, it would have been impossible for Pagel to have tossed the cocaine without detection. When the defense moved for admission of the photographs into evidence, the government objected on the ground that they did not adequately reflect the scene at the time of the stop and search. The district court sustained the government's objection and refused to admit the photographs into evidence. After less than an hour of deliberations, the jury asked for the photographs, at which point the defense again moved to admit them into evidence. Again, the court denied the motion. About an hour later, the jury returned with a guilty verdict.

## II.

### A.

Pagel first argues that the stop and search of Larsen's Oldsmobile was unlawful and that the fruits of that stop and search should have been suppressed at his trial. He does not challenge the Wisconsin regulations allowing Lane to search Larsen's living quarters or property on "reasonable grounds" to believe the property contained contraband. Nor could he. The search of Larsen's motel room and automobile were made by a parole agent pursuant to the same regulations that were upheld in *Griffin v. Wisconsin*, —— U.S. ——, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). There, the Court upheld the warrantless search of a probationer's residence, holding that it was " 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." *Id.* 107 S.Ct. at 3171. Instead, Pagel argues that Larsen's parole status was merely a pretext for violating Pagel's Fourth Amendment rights by stopping and searching Larsen's car, which he was driving. According to Pagel, "Lane's authority to conduct an administrative search did not create implied authority to infringe the defendant's liberty interests by stopping the car or searching property lawfully under his control."

■ We reject this argument, as did the magistrate and the district court. The target of the stop and search was Larsen's property, not Pagel, and the search of the car by Lane was lawful under the applicable Wisconsin regulations. It was, of course, necessary to stop the car before Lane could search it, but the stop itself did not violate Pagel's Fourth Amendment rights. That Pagel happened to be driving the car at the time Endres executed the stop to enable Lane to search it cannot render an otherwise legal stop and search illegal. Indeed, under Pagel's reasoning, any time a third person not the target of a lawful search pursuant either to a warrant or a valid regulation such as Wisconsin's happened to be in the residence or car that was the target of the search, the search would be rendered illegal. Nonsense. If Pagel were driving a car that, unknown to him, was stolen, police clearly could have stopped the vehicle. And if Pagel had been present at Larsen's residence at the time Lane conducted the parole search and, during the search, committed an illegal act in front of Lane and law enforcement officers, he clearly could have been arrested.

■ Pagel also argues that when parole agent Lane had the law enforcement officers stop Larsen's Oldsmobile so he could search it, "exigent circumstances were totally absent." Pagel contends that, because Lane had not received approval to search Larsen's car from his supervisor, exigent circumstances had to exist before the search could be proper under HHS § 328.21. This, too, is nonsense. As the magistrate and district court concluded, there were exigent circumstances. There is no disputing the existence of reasonable grounds to believe that Larsen had an automatic weapon in his house or car. Two witnesses, Jacobson and Krueger, indicated that Larsen possessed at least one handgun. Indeed, Krueger and others in the motel had heard gunshots and Larsen had admitted that he had fired a gun. Moreover, when Lane searched his motel apart-

ment, Larsen had behaved suspiciously outside the motel, had attempted deception with the plastic gun, and had lied about the presence of any weapon. Thus, when Lane found the revolver in the bedroom and Jacobson said it was not the automatic weapon he had seen days before, it was more than reasonable to suspect that there was another automatic weapon and that it might have been in Larsen's car. As the magistrate pointed out, under these circumstances, a warrantless search of the car would have been justified under conventional Fourth Amendment jurisprudence. *See United States v. Ross,* 456 U.S. 798, 804–09, 102 S.Ct. 2157, 2162–64, 72 L.Ed.2d 572 (1982); *Griffin,* 107 S.Ct. at 3170. In short, the stop and search of Larsen's vehicle was lawful and the fruit of the search —the drug paraphernalia found in the Oldsmobile's trunk—was admissible.

### B.

■ Pagel also argues that his identification was the fruit of his unlawful arrest and should have been suppressed at trial. Although the magistrate did not address this issue directly in his report and recommendation, he did find that Endres had independently identified Pagel when he stopped Larsen's car. The magistrate indicated that, because he had already determined that the stop was lawful, Pagel's identification was not the product of any illegality and, accordingly, was admissible under the "independent source" doctrine.

Pagel objected to the magistrate's finding, arguing that he was not identified by anyone until after he was unlawfully placed in custody. The district court rejected Pagel's argument, however, finding that "there was testimony at the evidentiary hearing which establishes that the defendant was identified prior to and independently of the illegal arrest." According to the court

> Kretschman testified that in the course of his investigation of a burglary in the city of Verona, he learned that a parolee or probationer named Wade Larsen was living in Verona, and that he decided to check to see if Larsen matched the de-

scription of several burglary suspects.... Detective Kretschman testified that he contacted Officer Ensloe of the Verona Police Department. Detective Kretschman further testified that he learned from Officer Ensloe that Dane County Sheriff's Department Deputy Reis had recently made a traffic stop involving Larsen, and that Deputy Reis had gone to the motel where Larsen lived in order to issue a citation to Larsen and had made contact with defendant at Larsen's motel room.... Detective Kretschman testified that he had thus become aware of the fact that Larsen and defendant frequented the same hotel room from talking with Officer Ensloe, before he contacted Probation Officer Lane or went with him to Larsen's motel room. *Ibid.* Thus, defendant had been identified by Detective Kretschman prior to and independently of the illegal arrest. Furthermore, Detective Kretschman testified that he believed that someone "obtained [defendant's] identification prior to my arriving and told me who he was." ... In view of the record evidence that defendant was identified independently of the illegal arrest, the magistrate was correct in concluding that defendant's identification was admissible.

Although Pagel on appeal highlights some testimony that does seem to contradict the magistrate's and district court's view that Pagel was identified before he was unlawfully placed in custody, we are unable to conclude that the magistrate's and district court's findings were clearly erroneous and, therefore, that the district court erred in refusing to suppress Pagel's identification.

### C.

■ Finally, Pagel argues that the district court erred in refusing to admit into evidence the photographs depicting the relative position of Larsen's car and the adjacent vehicle under which the cocaine was found. According to Pagel, some government witnesses testified that, although they did not recreate the exact scene of the stop, the photographs accurately depicted

the relative positions of the two vehicles and were probative, the court should have admitted them into evidence. The court, however, based on the testimony of Endres, found that the photographs did *not* adequately recreate the conditions that existed when Pagel was arrested. Finding that the photographs would therefore tend to confuse and mislead the jury, and that they would not be helpful or relevant to the jury's decision, the court refused to admit the photographs into evidence. On this record, we cannot conclude that the district court abused its broad discretion in excluding this particular evidence and, therefore, will not reverse its evidentiary ruling. *See United States v. Garver,* 809 F.2d 1291, 1297 (7th Cir.1987).

The defendant's conviction is

AFFIRMED.