STATE OF CONNECTICUT *v.* ERROL A. WALKER
(13755)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and HULL, Js.

1

Argued February 8—decision released May 8, 1990

*Jeremy N. Weingast,* for the appellant (defendant).

*Geoffrey E. Marion,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Kevin McMahon,* assistant state's attorney, for the appellee (plaintiff).

CALLAHAN, J. The defendant, Errol A. Walker, was charged with and convicted of the crime of arson in the first degree in violation of General Statutes § 53a-111 (a) (1).[1] The charge arose out of an incendiary fire that occurred at a three-story multiple family dwelling at 483-485 Garden Street in Hartford at approximately 3:15 a.m. on June 9, 1987.[2]

---

[1] General Statutes § 53a-111 (a) (1) provides in pertinent part: "ARSON IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

[2] There were three apartments in the building; only one, however, was occupied on the morning of the fire. A family named Merritt lived in the first floor apartment. The Merritts were literally blown out of their beds by the explosion that preceded the fire.

There was evidence of the following facts. The defendant was the landlord of the building at 483-485 Garden Street. The building was in poor condition and needed considerable renovation and repair work. On the date of the fire, the premises were covered by a fire insurance policy issued by the Middlesex Mutual Insurance Company.

On the morning of June 9, 1987, Glenn Mauldin was visiting a friend at another address on Garden Street. At 3:15 a.m., when he left his friend's house and entered his automobile, his attention was attracted by an explosion and then flames emanating from 483-485 Garden Street. Immediately after hearing the explosion and observing the flames, Mauldin saw a man run from the side of the burning building. The man ran to a car that was parked in front of Mauldin's. Mauldin immediately drove to the rear of the car, took note of its license plate, and then pulled up and stopped alongside it. While parked alongside the car Mauldin was able to observe the man and the automobile for about thirty seconds in the light of his headlights, his side parking lights, and an overhead street light. Thereafter, Mauldin drove to the nearest fire station to report the fire. When he arrived at the station, however, he learned that the fire had already been reported. He then drove back to Garden Street and gave police officers who had responded to the fire the license plate number he had noted and a description of the car and the man he had seen.[3] Later, on June 18, he gave the police a written statement.

---

[3] Mauldin initially gave the police the plate number 485EQS. The defendant's plate number is actually 465ESO. There is a tag attached to the plate, however, that causes the "O" to resemble a "Q." At trial Mauldin, in reply to the question, "Do you remember the numbers right now?" replied, "465ESQ." He described the car as "[a]bout a '74, '75, lime, light green, Mercury Marquis."

Kelton Merritt, who lived in the first floor apartment at 483-485 Garden Street and was home with his family at the time of the explosion and fire, told the investigating authorities that the car described by Mauldin belonged to his landlord, the defendant. The authorities made numerous attempts to contact the defendant over the next two weeks, and left messages at places that he frequented. The defendant, however, did not call the fire marshall's office until June 25, more than two weeks after the fire. Subsequent to contacting the authorities, the defendant gave a statement in which he said that he had gone to work in Putnam at 4 a.m. on the day of the fire. The police, however, learned from the defendant's employer that the defendant had actually gone to work in Norwich at 7 a.m. on the day of June 9. The defendant was arrested and charged with arson in the first degree pursuant to a warrant on August 26, 1987.

I

The defendant first claims that his constitutional right to a fair trial was violated by the admission into evidence, over his objection, of a photograph of his automobile.[4] The facts underlying the defendant's claim can be stated briefly.

At trial, Mauldin was shown a photograph of the defendant's automobile by the prosecutor who stated: "It's not a very good picture. Can you identify that?" Mauldin said that he could and proceeded to identify the photograph as depicting the same automobile and license plate he had seen on the morning of the fire. The defendant objected to the admission of the photograph on the ground that an insufficient foundation had been laid as to who had taken it and under what circumstances. The trial court denied the defendant's

---

[4] The photograph showed the rear of the automobile and the license plate.

objection and the defendant took an exception.[5] Thereafter, on cross-examination Mauldin again identified the photograph as showing the automobile and license plate he had seen on the morning of June 9. He was then asked by defense counsel whether the photograph was "a fair representation of what [the car] looked liked that night." In response, he answered, "No." He then went on to explain that the background of the photograph was darker than the scene actually was on the morning of the fire, because on that morning the area of the defendant's automobile had been illuminated by a street light and the lights of his automobile. The defendant did not renew his objection at that point.

The defendant's claim that the admission of the photograph constituted constitutional error is without merit. " 'Generally, "the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." State v. Periere, [186 Conn. 599, 611, 442 A.2d 1345 (1982)], quoting United States ex rel. Bibbs v. Twomey, 506 F.2d 1220, 1222 (7th Cir. 1974).' State v. Talton, 197 Conn. 280, 289-90, 497 A.2d 35 (1985)." State v. Vilalastra, 207 Conn. 35, 46, 540 A.2d 42 (1988). The defendant has failed to cite a single case from any jurisdiction wherein any court has held that the admission into evidence of a photograph in a situation even remotely analogous to that on appeal is constitutional error, state or federal. Clearly the defendant " 'has put a constitutional tag on a nonconstitutional evidentiary ruling.' State v. Douglas, 203 Conn. 445, 455, 525 A.2d 101 (1987) . . . ." State v. Vilalastra, supra; State v. Vitale, 197 Conn. 396, 403, 497 A.2d 956 (1985); State v. Gooch, 186 Conn. 17, 18, 438 A.2d 867 (1982).

---

[5] The defendant concedes in his brief on appeal that these grounds for his objection were incorrect.

Photographic evidence is admissible if it has " 'a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry.' " *State* v. *Doehrer,* 200 Conn. 642, 649, 513 A.2d 58 (1986), quoting *State* v. *DeJesus,* 194 Conn. 376, 381, 481 A.2d 1068 (1984). Verification of a photograph is a preliminary question of fact to be determined by the trial court. *State* v. *Castagna,* 170 Conn. 80, 89, 364 A.2d 200 (1976). "Whether a photograph shows a situation with sufficient accuracy to render it admissible, is a preliminary question for the court . . . ." *Voltz* v. *Orange Volunteer Fire Assn., Inc.,* 118 Conn. 307, 311-12, 172 A. 220 (1934); *Blanchard* v. *Bridgeport,* 190 Conn. 798, 806, 463 A.2d 553 (1983). Further, the trial court has wide discretion in admitting photographic evidence and its determination will stand unless there has been a clear abuse of that discretion. *State* v. *DeJesus,* supra, 382.

When Mauldin was shown the photograph in issue, he had already described the automobile he had seen on Garden Street on the morning of the fire. That description closely paralleled the defendant's automobile as shown in the photograph. Moreover, Mauldin never gave any indication that the dark background of the photograph distorted the image or caused him any problem in seeing and identifying the automobile it depicted. While the photograph shown to Mauldin may not have been "very good," its subject was discernible and it was obviously relevant evidence in the case. The trial court clearly did not abuse its broad discretion by admitting the photograph into evidence.[6]

---

[6] Further, there was such an abundance of evidence linking the defendant to the automobile described by Mauldin that, even if the trial court erred in admitting the photograph, it is difficult to see how the defendant could possibly demonstrate that the evidentiary ruling was harmful. *State* v. *Vilalastra,* 207 Conn. 35, 47, 540 A.2d 42 (1988).

## II

The defendant next claims that his right to a fair trial was violated by the court's denial of his request for a continuance. We are unpersuaded.

The relevant facts as gleaned from the record concerning this claim are as follows. Prior to the commencement of the jury voir dire on Thursday, December 8, 1988, defense counsel informed the court that, because of the state's open file policy in this case, no further discovery or continuances were necessary.[7] Later, during the voir dire, the state's attorney told the court that the police had just informed him that there were additional reports that he did not have, including one revealing that there had been an identification of the defendant from photographic arrays by the eyewitness, Mauldin. These police reports had not previously been made available to the state and therefore had not been disclosed to the defendant.

On Monday, December 12, the state revealed that, some weeks after Mauldin had given a written statement to the police, he had selected photographs of the defendant from two police photographic arrays as depicting the person he had seen on Garden Street on the morning of the crime. The state then expressed an intention to offer those photographic arrays in evidence. At that time defense counsel stated that, in view of what he perceived would be the court's ruling on a motion to suppress the photographic identifications, he would need a short continuance to investigate further. The trial court pointed out to defense counsel that he had been made aware of the photographic identifications the previous Thursday. The court said, however, that it would be disposed to grant a reasonable con-

---

[7] The case had been expedited in response to the defendant's motion for a speedy trial.

tinuance if it were necessary. The court then inquired of counsel as to whether he was requesting a continuance at that time. Counsel replied that he was not, and that he had no problem with Mauldin testifying on the state's case-in-chief. He stated, however, that, thereafter, he would need a continuance "to check out this key witness" because certain events had transpired that gave him doubts about Mauldin's credibility.[8]

Thereafter, in reply to a question, the state informed the court that the defendant's counsel had failed to appear on December 8 at a meeting scheduled for the purpose of disclosure. The state also informed the court that the photographic arrays had been available all day on Friday, December 9, and that defense counsel had not taken advantage of the opportunity to inspect them. Subsequently, defense counsel acknowledged that he had been aware that Mauldin would be a state's witness from the time that he had filed an appearance in the case. He contended, however, that the "[p]hoto array casts a whole new light on the subject."

At the commencement of trial on December 12, Mauldin testified as the state's first witness. Over the defendant's objection he made an in-court identification of the defendant.[9] No testimony relating to the photographic identification was elicited, however. After Mauldin had nearly completed his testimony on direct examination, defense counsel stated that, at that point, he would "like to avail [himself] of the continuance." He set forth two reasons for his request. He stated first,

---

[8] Defense counsel claimed that, after the jury voir dire, he had gone to the address listed for Mauldin in the police reports, with an investigator and the defendant, to speak to Mauldin. There he encountered a man, who, he later told the court, he was 99 percent sure was Mauldin. The man, however, said that Mauldin lived at another address and closed the door. Mauldin denied ever having seen or spoken to defense counsel.

[9] The ruling of the trial court allowing Mauldin's in-court identification of the defendant has not been made a subject of this appeal.

that he would like to photograph the crime scene prior to his cross-examination of Mauldin, and, second, that he needed time to investigate Mauldin.

In response, the trial court noted that no evidence of the photographic array had been offered and observed "that the matters that have been produced by the state through [Mauldin] were, in fact, discoverable as far back as the arrest of the defendant and that the suggestion of the court as to [a] reasonable continuance would be on the basis of a motion to suppress the photo array[s], which has not been offered . . . ." The court denied the defendant's request for a continuance. Thereafter, defense counsel said that he "could probably work around the decision, [and] continue . . . the trial" as long as Mauldin was available to be recalled. When given assurance that Mauldin would be available, defense counsel stated, "Okay. Well, then I take an exception with the ruling and go on with the case."

In his brief on appeal concerning this issue the defendant appears to argue that he was provided ineffective assistance of counsel rather than that he was the victim of an error by the trial court.[10] A claim of ineffective assistance of counsel, however, is more properly pursued in a habeas corpus proceeding rather than on direct appeal. *State* v. *Williamson,* 206 Conn. 685, 706, 539 A.2d 561 (1988). *State* v. *McIver,* 201 Conn. 559, 568–69, 518 A.2d 1368 (1986); *State* v. *Leecan,* 198 Conn. 517, 542, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986). The only issue to be resolved on the appeal of a trial court's refusal to grant a request for a continuance is whether the court abused its discretion by denying the request.

"The determination of whether to grant a request for a continuance is within the discretion of the trial

---

[10] The defendant's counsel on appeal was not the trial counsel.

court, and will not be disturbed on appeal absent an abuse of discretion. *Ungar* v. *Sarafite,* 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921, reh. denied, 377 U.S. 925, 84 S. Ct. 1218, 12 L. Ed. 2d 217 (1964); *State* v. *Williams,* 200 Conn. 310, 320, 511 A.2d 1000 (1986); *State* v. *Marra,* 195 Conn. 421, 437–38, 489 A.2d 350 (1985)." *State* v. *Aillon,* 202 Conn. 385, 394, 521 A.2d 555 (1987). " 'It must be shown that the trial judge acted arbitrarily and substantially impaired defendant's ability to defend himself, before an appellate court will conclude that the trial judge abused his discretion. The test is a stringent one.' *United States* v. *Ellenbogen,* 365 F.2d 982, 985 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S. Ct. 892, 17 L. Ed. 2d 795 (1967)." *State* v. *Beckenbach,* 198 Conn. 43, 47, 501 A.2d 752 (1985). " 'The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' *Ungar* v. *Sarafite,* supra, 589." Id., 47–48. "The right of a defendant to have a continuance is not . . . absolute"; *State* v. *Bethea,* 167 Conn. 80, 83, 355 A.2d 6 (1974); and "[e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made." *Ridgeway* v. *Ridgeway,* 180 Conn. 533, 538, 429 A.2d 801 (1980).

A review of the record does not reflect an abuse of discretion by the trial court in this instance. The two reasons cited by defense counsel in his request for a continuance failed to present the trial court with sufficient reason to postpone the proceedings. The request for a continuance in order to photograph the crime scene was patently tardy and it lay well within the discretion of the trial court to refuse a continuance on that ground. Defense counsel's second reason, i.e., so that he could investigate Mauldin, was also belated. It is clear, from the affidavit accompanying the arrest warrant in this case, that Mauldin was the only eyewitness

to the incident and that he could identify the defendant's car and, quite probably, the defendant. It was obvious simply from reading the affidavit that, if the state were to have any case at all, it depended on Mauldin's testimony. Defense counsel had access to that affidavit from the time that he filed an appearance. The request for time to investigate Mauldin at the trial stage, therefore, did not constitute a persuasive reason for a continuance. Furthermore, other than speculation on appeal, there is no reason to believe that the denial of the request impaired the defendant's ability to present a defense. There is no merit to this claim of the defendant.

## III

The defendant's final claim is that the trial court erred by violating his constitutional right to a fair trial in its refusal to admit into evidence a photograph of the defendant standing beside the front porch at 483-485 Garden Street. Once again the defendant has constructed a constitutional mountain out of an evidentiary molehill. *State* v. *Vitale,* supra, 403; *State* v. *Gooch,* supra, 18; see Part I of this opinion, supra. The defendant, however, took an exception to the trial court's ruling and we are therefore required to determine whether the court committed error by excluding the photograph.

This claim has its genesis in the testimony of a defense witness, Samuel Malcolm, an elderly man who lived at 481 Garden Street, next door to 483-485. Malcolm testified that he was awake in the early hours of the morning on June 9, 1987, when he heard two loud explosions. He then looked from his window and saw that the porch at 483-485 Garden Street was on fire. Thereafter, he stated, he called the fire department and woke up the people in his house and at 483-485

Garden Street.[11] He then stood on the front porch until the fire trucks arrived.

On redirect examination Malcolm testified that while on the porch he saw the "shadow" of a "short," "little man" run around the corner of 483-485 Garden Street.[12] He stated that he knew the person who cast the shadow was short because he "couldn't see his head" above the front porch "railing."[13]

Later that same day, while the defendant was testifying, a photograph was offered into evidence that depicted the defendant standing directly next to, and a head above, the porch at 483-485 Garden Street. The photograph had apparently been taken on December 14, during the luncheon recess by the defendant's counsel. The photograph shows only the top portion of the defendant's body and a very small section of the porch. The purpose of the offer, according to defense counsel, was to "buttress the testimony to show consistency with the testimony of Malcolm; he saw somebody go past the defendant's porch who didn't measure up to the height of the porch." The obvious implication for the jury was that, if the defendant was taller than the porch "railing,"' a third person might have committed the crime.

The state objected to the defendant's offer of the photograph on the ground that it did not accurately "reflect" Malcolm's testimony because Malcolm had "never testified [that] the person he saw was right next

---

[11] Malcolm's testimony is fragmented and difficult to follow. It is not clear from the transcript how he went about waking up the various people in the house. Nor is it clear how much time transpired while he was doing this.

[12] Nothing in relation to the subject of this testimony surfaced on either direct or cross-examination.

[13] What Malcolm described as a "railing" was actually the closure at the end of the porch. The porch did not have a "railing" per se.

to the building. He said he saw a silhouette and a shadow by the corner." The trial court sustained the state's objection.

"Rulings as to the admissibility of photographs are clearly within the discretion of the trial judge and will only be overturned upon a showing of abuse of discretion." *United States* v. *Akers,* 702 F.2d 1145, 1149 (D.C. Cir. 1983); *State* v. *Douglas,* 203 Conn. 445, 454, 525 A.2d 101 (1987); *Livingstone* v. *New Haven,* 125 Conn. 123, 128, 3 A.2d 836 (1939); 29 Am. Jur. 2d, Evidence § 786. This record obviously reflects a great deal of disparity between the conditions under which the defendant's photograph was taken and those described in Malcolm's testimony. "Whether photographs 'show proportions and relations sufficiently to be of value as evidence in the trial of a cause, is a preliminary question to be decided by the court, and as to which its decision can rarely be reviewed.' *Harris* v. *Ansonia,* 73 Conn. 359, 364, 47 A. 672 (1900) . . . ." *State* v. *Douglas,* supra. Applying those rules to these facts we cannot conclude that the trial court abused the broad discretion vested in it when it excluded this particular photograph.[14] *United States* v. *Pagel,* 854 F.2d 267, 272–73 (7th Cir. 1988). We, therefore, will not disturb its evidentiary ruling.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[14] Another photograph was admitted into evidence depicting the porch sans defendant.