## STATE OF CONNECTICUT *v.* GENT LEE DANIELS
(14306)

Landau, Schaller and Hennessy, Js.

Argued February 15—officially released August 6, 1996

*Mary Miller Haselkamp*, assistant public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David Gold*, assistant state's attorney, for the appellee (state).

LANDAU, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1),[1] assault in the third degree in

---

[1] General Statutes § 53a-70 (a) provides in pertinent part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force . . . ."

violation of General Statutes § 53a-61 (a) (1)[2] and unlawful restraint in the first degree in violation of General Statutes § 53a-95.[3] On appeal, the defendant claims that the trial court improperly (1) abused its discretion by permitting the victim to testify about past incidents of sexual abuse, (2) abused its discretion by permitting the state to use a peremptory challenge to discharge a juror after the jury had been selected and (3) deprived him of his right to a fair trial by permitting the state to engage in prosecutorial misconduct. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. In June, 1991, the defendant, a music instructor at Southern Connecticut State University (SCSU), made plans with W, a student at SCSU, and Sharon Huie, a resident advisor at an SCSU dormitory, to go out for dinner. The defendant stated that he would arrive at Huie's dormitory to pick up Huie and W between 8:30 and 8:45 p.m. He also offered to drive W to her home in Bridgeport after dinner. The defendant arrived at the dormitory at approximately 10:30 p.m. Because Huie had to go to work at 11 p.m., she could not join the others as planned. W and the defendant left and went to a local restaurant for dinner.

At approximately midnight, before driving her to Bridgeport, the defendant informed W that he wanted to stop at his house to pick up a tape to take to a friend who also lived in Bridgeport. Because W knew that the defendant was married and had a child, she willingly accompanied the defendant into his house to wait for

[2] General Statutes § 53a-61 (a) provides in pertinent part: "A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury . . . ."

[3] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

him. Once inside, the defendant did not turn on any lights, and W remained in the living room while the defendant went into a back room. After a short while, the defendant returned to the living room and W noticed that he was now wearing cologne that he did not have on earlier that night.

The defendant sat on the sofa next to W and began touching her hair. Although W suspected that the defendant was making advances toward her, she rejected the notion because she believed that the defendant's wife and child were asleep in the house. W then stood up, asked the defendant to take her home and began walking toward the door. The defendant grabbed her from behind by her shirt and pulled her back onto the sofa. W resisted the defendant and a struggle ensued. The defendant overpowered W and sexually assaulted her. W, who is asthmatic, had difficulty breathing and pleaded with the defendant to stop. When the defendant eventually stopped, the victim was bleeding. She went into the defendant's bathroom where she washed blood from her legs and underwear. The defendant then drove the victim to Bridgeport.

W did not report the incident immediately. After a subsequent confrontation with the defendant the following November, however, W told friends what had happened in June and they convinced her to contact the police.

The jury convicted the defendant on December 2, 1993, and no direct appeal was taken. On April 27, 1994, the defendant, pro se, filed a petition for a writ of habeas, corpus alleging that his lawyers' errors resulted in the loss of his right to appeal.

On October 12, 1994, the habeas court accepted a stipulation in which the state and the defendant agreed that the defendant's right to appeal should be restored and rendered judgment in accordance with the stipula-

tion, and this direct appeal was filed.[4] In *State* v. *Phidd*, 42 Conn. App. 17, 597 A.2d 846, cert. denied, 238 Conn. 907, 679 A.2d 2 (1996) (defendant sought certification to challenge decision on merits of appeal), we held that where a habeas petitioner raises a claim of ineffective assistance of appellate counsel arising out of a failure of counsel to file an appeal and the facts, either by evidence or stipulation, support a finding that the petitioner's appellate rights were unconstitutionally compromised by counsel's ineffective assistance, the habeas court may order the restoration of petitioner's appellate rights as relief in the habeas action.

Because we adhere to the strong judicial policy embodied in the doctrine of stare decisis, we do not address the issue decided in *Phidd*. Rather, we follow our previous holding. Pursuant to Practice Book § 4135, however, we find that the following issues decided in *Phidd* involve substantial questions of law that should be reviewed by the Supreme Court: (1) whether a habeas court has authority to restore appellate rights, and (2) whether, if such authority exists, a habeas court may restore appellate rights based on its acceptance of a conclusory stipulation by the parties. We, therefore, request certification of these questions.[5]

I

The defendant first claims that the trial court abused its discretion by allowing W to testify about two past

[4] On November 23, 1994, the trial court granted the defendant's motion for a waiver of fees and the appeal was filed within the ensuing twenty day period.

[5] We note that absent this request, because of the procedural posture of *Phidd*, certification of these issues via Practice Book § 4126 is doubtful inasmuch as both the state and the defendant agreed and stipulated to the action of the habeas court.

Although the opinion in this case agrees with both the reasoning and the result in *Phidd*, and while the appellate panel in *Phidd* continues to adhere to the correctness of that decision, the *Phidd* panel nonetheless joins in the request of the panel in this case that the Supreme Court certify this

incidents in which she was sexually assaulted by other men. The defendant asserts that the evidence was not relevant to the issue of whether the defendant sexually assaulted W, nor was it probative as to why she delayed in reporting this incident to the police. He also argues that the evidence was precluded by Connecticut's rape shield statute, General Statutes § 54-86f.[6]

During W's direct testimony, the state inquired as to why she did not tell anyone about the alleged sexual assault earlier than she did. In response, W testified that she felt that no one would believe her because she had willingly entered the defendant's house late at night and, because the defendant had told her that he was a state trooper, she believed that other police officers would support him. She also testified that she had twice been the victim of a sexual assault in the past and that, when she reported those incidents, nothing was done.[7]

case pursuant to Practice Book § 4134 et seq. because of the importance of this issue to both appellate courts.

[6] The defendant's argument that General Statutes § 54-86f precludes the admissibility of evidence proffered by the victim in this sexual assault is unfounded. The statute is intended to protect a *victim's* personal privacy; *State* v. *Kulmac*, 230 Conn. 43, 53, 644 A.2d 887 (1994); by governing the type of evidence a *defendant may proffer* concerning the victim's past sexual conduct. See *State* v. *Kindrick*, 30 Conn. App. 56, 619 A.2d 1 (1993). Accordingly, we treat this claim only as a challenge to an evidentiary ruling.

[7] During W's direct testimony, the following colloquy took place:

"Q. Now, in the time that you had known the defendant, did he tell you that he had another job as well as being [an instructor at SCSU]?

"A. He said he was a state trooper, and I knew he was a teacher at Hillhouse.

\* \* \*

"Q. Did you tell your family, friends what had happened?

"A. No.

"Q. Why?

"A. Because I didn't think nobody was going to believe me.

"Q. Why did you think that?

"A. Because I just started thinking about the night, I was in his house around one o'clock in the morning, people don't believe that you could be raped in a man's house that time of night.

"Q. What did you think people would believe?

"It is well established that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a clear showing of a clear abuse of the court's discretion. . . . Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclu-

"A. They would believe that I wanted to have sex with him.

\* \* \*

"Q. And did you—had you had an experience in the past when you were much younger involving sexual assault?

"A. Yes

"Q. Could you explain?

"A. It was my uncle.

"[Defense Counsel]: Excuse me, Judge. Is that relevant?

"The Court Do you claim it, Mr. Gold?

"[Prosecutor]: Well, I do, Your Honor, because I think it's offered to explain one of the reasons that [W] did not report this.

"The Court: Overrule the objection.

\* \* \*

"Q. Did you report what [your uncle] was doing?

"A. I told my grandmother.

"Q. What did she say?

"A. She said it was not true, she didn't believe me, she said I was fresh.

\* \* \*

"Q. In addition to the incident with your uncle, was there an incident when you were in California in a church—at a church function?

"A. Yes.

\* \* \*

"Q. And what happened in California?

"A. I went to the soda machine outside my room to get a soda.

"Q. This was in a hotel?

"A. Yes.

"Q. Did someone come on to the scene, though?

"A. Yes.

"Q. So, that didn't get very far?

"A. No, just my clothes were ripped and he was on me, but he didn't get far.

"Q. Did you report that to your—who did you first report it to?

"A. My godmother.

"Q. Okay. And what did she do with that information?

"A. She reported it to the front desk."

sion [for which it is offered], even to a slight degree.
. . . [T]he fact that evidence is susceptible of different
explanations or would support various inferences does
not affect its admissibility, although it obviously bears
upon its weight. So long as the evidence may reasonably
be construed in such a manner that it would be relevant,
it is admissible. . . ." (Citations omitted; internal quo-
tation marks omitted.) *State* v. *Bruno*, 236 Conn. 514,
549, 673 A.2d 1117 (1996).

W's testimony that she was twice sexually assaulted
in the past and that on both occasions nothing was
done after she reported those incidents could reason-
ably support an inference that she was reluctant to
report the incident involving the defendant. Although
W had already testified that she feared that no one
would believe her because she had voluntarily entered
the defendant's house late at night and because she
believed that the defendant was a state trooper, the
proffered testimony clearly had a tendency to aid the
jury in its determination as to why she delayed before
reporting the incident to the police. We conclude, there-
fore, that the trial court did not abuse its discretion by
admitting this testimony.

## II

The defendant next claims that the trial court improp-
erly granted the state's request to allow it to exercise
a peremptory challenge to dismiss a venireperson after
she was accepted by both parties. He argues that,
although the jury was not yet sworn, the venireperson
could be dismissed only for cause, which did not
exist here.

It is well settled that "[o]nce a juror has been accepted
by both parties, the absolute right to exercise a peremp-
tory challenge is lost. *Walczak* v. *Daniel*, 148 Conn. 592,
596–97, 172 A.2d 915 (1961); *DeCarlo* v. *Frame*, 134

Conn. 530, 535, 58 A.2d 846 (1948); *State* v. *Potter*, 18 Conn. 166, 176 (1846). The trial court may, however, 'in its discretion permit such a challenge to be made at any time before the jury is sworn.' *Walczak* v. *Daniel*, supra, 597, quoting *DeCarlo* v. *Frame*, supra. See also *State* v. *Potter*, supra, 176, in which our Supreme Court stated that '[o]ur practice gives one advantage to the prisoner, that if anything new has occurred since the juror was directed to take his seat as juror, the party will not be absolutely precluded from taking the benefit of it, as he is in England after he is sworn, unless by consent.' . . ." (Citation omitted.) *State* v. *Collins*, 38 Conn. App. 247, 252–53, 661 A.2d 612 (1995).

After the jury was selected but not yet sworn, one venireperson contacted the trial court's clerk to inform the court that she was employed by a law firm that had, in the past, represented another SCSU professor who had also been accused of sexual misconduct. Following this disclosure, the court allowed the parties to voir dire the prospective juror further. During the supplemental voir dire, the venireperson testified that her exposure to the previous matter left her dissatisfied with SCSU security police. She testified that she felt that the police "were too quick to make a judgment against the [other] professor without doing a further investigation" and that the professor had been wrongly accused. Although the venireperson also indicated to the court that she would view this case with an open mind, upon completion of the voir dire, the court allowed the state to exercise a peremptory challenge to dismiss her.

Under these circumstances, there is no question that ample grounds existed to allow the trial court to conclude that, if this information had come to light during jury selection, the state would have exercised a peremptory challenge to dismiss this prospective juror. For this reason, and because the jury had not yet been

sworn, we conclude that the trial court properly exercised its discretion in permitting the state to exercise a peremptory challenge. See *Walcazk* v. *Daniel*, supra, 148 Conn. 596.

The defendant finally claims that comments made by the prosecutor during the cross-examination of the defendant's wife and the closing argument constituted a pattern of "blatant misconduct" that was so severe and egregious that he was deprived of his right to a fair trial as guaranteed by article first, § 8, of the Connecticut constitution and the fourteenth amendment to the United States constitution.[8] Because some of the defendant's claims of misconduct were not preserved at trial, we will consider them apart from his claims that were preserved.

## A

## The Preserved Claims

The defendant complains that certain questions asked of Brenda Daniels, the sole defense witness, during cross-examination were improper because the state asked her to characterize the veracity of another witness' testimony. During the cross-examination, the prosecutor asked Brenda Daniels whether she heard Huie testify that, because the defendant was late in arriving at the dormitory on the night of the incident, Huie had called the defendant's home and received no answer. In reply, Brenda Daniels said that she had an answering machine that "I constantly leave on,"

[8] Although the defendant makes his claim under the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution, he has failed to support his appellate claim with an independent analysis under the Connecticut constitution. We, therefore, deem that claim to be abandoned. *State* v. *Francis*, 228 Conn. 118, 122 n.3, 635 A.2d 762 (1993); *State* v. *Carolina*, 40 Conn. App. 762, 768–69 n.7, 673 A.2d 562 (1996).

implying that if there had been a call that she would have known.

Upon objection by the defendant that this was an improper characterization of the evidence, the court overruled the objection because the question had been answered.[9] In two succeeding questions, however, the prosecutor again asked whether the witness felt Huie was trying "to fudge the facts" and whether the witness felt that any other prosecution witnesses were "fudging the facts." Although objections to both follow-up questions were sustained, the defendant contends on appeal that the questions themselves constituted prosecutorial misconduct because they improperly misled the jury into believing that if the testimony is conflicting, someone must be lying.

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process,

---

[9] Following that exchange, this colloquy took place:

"Q. She didn't say anything about an answering machine, she said nobody was home?

"A. She could say that, but she can't prove it.

"Q. She can't prove it?

"A. That's right.

"Q. Okay. I see. So, you think she is maybe trying to fudge it to help her friend out?

"A. I'm sure she is.

"[Defense Counsel]: Objection.

"Q. Are you sure she is?

"A. Yes.

"[Defense Counsel]: Judge, excuse me. I object to that; it's improper characterization.

"The Court: The witness has answered the question. It may stand.

"Q. So, this is not only—so Sharon Huie is also going to try to fudge the facts in this case to help her buddy out?

"[Defense Counsel]: I object to that also.

"The Court: Sustain the objection.

"Q. Were there any other witnesses, in your opinion, that were fudging the facts here?

"[Defense Counsel]: Objection, that is improper and there is no foundation.

"The Court: Sustain the objection.

we focus on several factors: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." *State* v. *Williams*, 41 Conn. App. 180, 190, 674 A.2d 1372 (1996).

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 538–39, 529 A.2d 653 (1987).

The state began the challenged questioning by noting that Brenda Daniels' testimony differed from Huie's because Huie did not mention an answering machine. To this, Brenda Daniels replied that Huie "can't prove it." It was the witness herself who first invited further inquiry by characterizing Huie's testimony as false. The state merely followed-up by again asking whether the witness believed that Huie's testimony was false, and then discontinued this line of questioning when two subsequent questions drew objections from the defendant that were sustained by the trial court. Thus, the questions as to whether Brenda Daniels believed that the state's witnesses were "fudging the facts" were few and infrequent. Moreover, because the state's questions were designed solely to elicit a reiteration of Brenda Daniels' opinion as to the veracity of the testimony of other witnesses, they did not concern an issue that was central to the case. For these reasons, and when viewed in the context of the entire trial, we conclude that the

state's questions on cross-examination were neither inflammatory nor likely to have contributed to the guilty verdict. The state's questions during the cross-examination of Brenda Daniels, therefore, did not constitute prosecutorial misconduct.

Next, the defendant complains that certain comments made by the prosecutor during the state's rebuttal closing argument improperly shifted the burden to the defendant to prove his innocence. Specifically, the defendant takes issue with the following remarks: "The defense just doesn't even propose anything, they just say that it is a doubt. It is not enough to argue doubt." We note, however, that when the challenged remarks are read in context with the rest of the state's rebuttal argument, the prosecutor was responding to and attempting to discredit the defendant's closing statement in which the defendant argued that a reasonable doubt existed by virtue of W's delay in reporting the incident. In effect, the state was suggesting to the jury that, although the defendant has the right to argue reasonable doubt, the defendant's assertion that a reasonable doubt existed under the facts of this case was absurd.

"[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Richardson*, 214 Conn. 752, 760, 574 A.2d 182 (1990). We conclude that, because the challenged remark was well within the scope of zealous and legitimate argument, it did not constitute prosecutorial misconduct.

## B

### Unpreserved Claims

The defendant complains that, during the state's rebuttal closing argument, the prosecutor improperly commented on the defendant's right not to testify,[10] invoked sympathy for the victim,[11] and misstated the evidence and expressed his personal opinions.[12] He claims that the prosecutor's remarks "constituted a pattern of repeated and blatant misconduct" that deprived him of a fair trial.

[10] The defendant asserts that the following comments violated his right not to testify: "And it's kind of ironic that he doesn't show up at 8:30, he shows up late enough so that he knows he is going to get to take her home. Sometime after ten . . . I think [W] said it was 10:30, but late enough so that he had to take her home. No explanation why he is late. Did he explain it? No. The guy just shows up two hours late, there is no explanation.

\* \* \*

"Rapes aren't committed in front of witnesses. You see, that's the way the system works. He raped her when he could rape her without witnesses. If you listen to what the defense says, who else can testify about the rape? . . . The defendant would put in any evidence they want as to this motive for her to come forward, but they haven't introduced any evidence to show you a motive . . . and does it seem odd that the defense calls one witness, Mrs. Daniels? That's the defense."

[11] The defendant claims that the following comments improperly invoked sympathy for the victim: "I'm sorry she wasn't able to fight harder. You know, she tried her level best. And I think her grabbing where she knew it was hurting was as smart and I would only hope that my loved ones would have the same courage.

\* \* \*

"The fact she couldn't use her karate skills, I hope that is offensive to you that this woman, who is really struggling for her life as far as she knows, doesn't fight hard enough and that's a defense to rape.

\* \* \*

"And the defense said, well, she should have gone to the hospital. Well, she is tough, she had to make a decision, she made it. And I urge you don't hold that against her because I think you see what somebody has to go through two and a half years later."

[12] The defendant does not direct our attention to any specific language or portion of the transcript that would be illustrative of this alleged misconduct. Rather, he couches his claim in general terms stating that the prosecutor "argued that Ms. Daniels testified that the state's witnesses were fudging their testimony."

Conceding that he failed to preserve these claims of misconduct properly, the defendant seeks review on appeal pursuant to *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973), and *State* v. *Golding*, 213 Conn. 233, 527 A.2d 823 (1989). Because the record is adequate for review and the defendant has alleged a claim of constitutional magnitude; see *State* v. *Williams*, supra, 204 Conn. 539 n.5; the first two prongs of *Golding* are satisfied. Hence, "[w]e will examine the defendant's claim to determine whether the alleged constitutional violation clearly exists and whether it deprived the defendant of a fair trial. *State* v. *Torrence*, 196 Conn. 430, 435, 493 A.2d 865 (1985)." *State* v. *Boyd*, 36 Conn. App. 516, 524, 651 A.2d 1313, cert. denied, 232 Conn. 912, 654 A.2d 356, cert. denied, 516 U.S. 828, 116 S. Ct. 98, 133 L. Ed. 2d 53 (1995).

Our Supreme Court has held that "prosecutorial misconduct can occur in the course of closing argument. *State* v. *Williams*, [supra, 204 Conn. 539]. In order to deprive a defendant of his constitutional right to a fair trial, however, the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . Id., 539–40." (Citations omitted; internal quotation marks omitted.) *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996).

Our review of the record leads us to conclude that, when the allegedly improper remarks made by the prosecutor on rebuttal are considered in light of the entire trial, further review of the defendant's claim of prosecutorial misconduct is unwarranted. *State* v. *Castonguay*, 218 Conn. 486, 508, 590 A.2d 901 (1991); *State* v. *Hanks*,

39 Conn. App. 333, 347, 665 A.2d 102, cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995); *State* v. *Nieves*, 36 Conn. App. 546, 554, 653 A.2d 197, cert. denied, 232 Conn. 916, 655 A.2d 260 (1995). Assuming, arguendo, that the challenged comments were improper, they were not representative of a blatant and egregious pattern of misconduct that either "deprive[d] the defendant of a fair trial; see *State* v. *Golding*, supra, 213 Conn. 239–40; or otherwise implicate[d] the fairness and integrity of and public confidence in the judicial proceedings. See *State* v. *Day*, 233 Conn. 813, 849, 661 A.2d 539 (1995)." *State* v. *Chance*, 236 Conn. 31, 64, 671 A.2d 323 (1996).

The judgment is affirmed.

In this opinion the other judges concurred.