STATE OF CONNECTICUT *v.* BENNIE PHARR
(15501)

Dupont, C. J., and Foti and Healey, Js.

Argued December 13, 1996—officially released April 1, 1997

*Auden Grogins,* special public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's

attorney, and *John C. Smriga*, assistant state's attorney, for the appellee (state).

HEALEY, J. The defendant, Bennie Pharr, appeals from the judgment of conviction, rendered after a jury trial, of one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4)[1] and one count of a commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k.[2] The conviction arose out of a robbery of a BP gas station in Bridgeport on May 13, 1995.

On appeal, the defendant claims that the trial court (1) denied him his right to a fair trial under the United States and Connecticut constitutions by "gratuitously" instructing the jury to believe a police officer whose testimony was critical to his conviction and (2) abused its discretion by refusing to exclude extraneous evidence of his prior arrests.

Among the facts the jury could have reasonably found are the following. On May 13, 1995, at about 5 a.m., Bridgeport police received a complaint of robbery at a the BP station at 927 Park Avenue, Bridgeport. Kadar Bobiso, the BP station cashier who was working the midnight to 6 a.m. shift, told police he had been robbed

[1] General Statutes § 53a-134 provides in relevant part: "Robbery in the first degree: Class B felony. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

[2] General Statutes § 53-202k provides: "Commission of a class A, B or C felony with a firearm: Five-year nonsuspendable sentence. Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

at gunpoint and gave police the following account of the robbery. A customer had tendered a $100 bill to pay $13 dollars for gas, a cigarette lighter and a pack of cigarettes. He was in the process of returning his $87 in change when suddenly the robber, a black male, appeared. Pointing a gun[3] at Bobiso with one hand, the robber put his other hand on the money. Bobiso took his hand off the money and let the robber take the cash. Bobiso asked the customer who was present during the robbery to help him, but the customer said he could not take such a risk. After taking the money, the robber ran to a car and drove off. Bobiso recorded the plate number of the vehicle, which he described as a blue Audi or Hyundai, and called the police. The robbery took about one minute. The customer, after asking for and receiving his change, left before the police arrived.

In his statement to Bridgeport police Detective Raymond Masek, Bobiso estimated the robber's height as five feet, eight inches and his weight as 130 pounds and characterized the robber as a black male in his mid-thirties with a medium Afro hairstyle and clean shaven except for, possibly, a light mustache. During the identification process at the police station, at which Masek was present, Bobiso reviewed two books with arrays of photographs of black males. From one of these books, Bobiso identified one photograph of the defendant as the man who robbed him. The photograph showed the defendant, a black male, with dreadlocks, glasses, a goatee and a mustache. The defendant, according to other police testimony during the trial, was five feet, eleven inches tall and weighed 180 pounds.[4]

Bobiso had seen the defendant at the BP station prior to the robbery, as well as once having seen him down-

[3] Bobiso described the gun as a "silver revolver" and as being a "small .38 millimeter."

[4] This information concerning the defendant was obtained by Masek from the National Crime Information Computer database, which has information compiled at the time of a previous arrest.

town in front of a store. After the date of the robbery, he had also observed the defendant as he drove by the BP station; at that time he called the police and gave them the license plate number he had observed on that car. The police, however, could not apprehend the defendant because the license plate number was not registered. Bobiso conceded that he did not know who the defendant was.

Thereafter, on the night of June 3, 1995, Officer Ricky DeWitt-Smith was on routine patrol in his police car and he stopped at the BP station, as he usually did, to check on the safety of the employee there. When he did so, a black male walked away from the window. Bobiso ran out and said to DeWitt-Smith, "He's the guy. He's the guy that robbed me. He's wanted for robbery." The officer approached this black male and told him that Bobiso was claiming that "you are the guy that robbed him" and that he was going to detain him for a while. After patting him down and placing him in the backseat of his police car, DeWitt-Smith asked him his name and for identification. The officer, on direct examination, said, "He gave me a name of Mark—I'm saying Freeman, but I'm not really sure exactly."

Having secured the black male in his patrol car, Dewitt-Smith then called the police station on his radio to determine if there was an active warrant out for the suspect. He also called for back-up assistance. That assistance arrived, at which time another officer informed DeWitt-Smith that his detainee was not Freeman and that his name was Pharr. At that time, DeWitt-Smith had been given a warrant for the suspect in the robbery of the BP station with a photograph of Pharr on it. He confronted the suspect with the name of Pharr as well as the warrant with the photograph of Pharr, but the defendant did not respond, nor did he ever offer DeWitt-Smith any identification. Once DeWitt-Smith had confirmed that a warrant had been activated, he

asked the defendant to step out of his patrol car, hand-cuffed him and placed him in the back of the assisting unit's patrol car. At the trial, DeWitt-Smith identified the defendant as the black male he had arrested as Pharr on June 3, 1995, at the BP station.

After the defendant's arrest, Masek conducted the investigation of the robbery, including taking Bobiso's statement and overseeing the identification process. Information obtained by him from the National Crime Information Computer (NCIC) indicated that Pharr had a prior arrest record. Masek referred to this both on direct and cross-examination. The defendant did not testify at the trial, although he did offer evidence, includ-ing an alibi.[5]

I

The defendant first claims that the trial court denied him his right to a fair trial under the United States and Connecticut constitutions[6] by "gratuitously instructing the jury to believe a police officer whose testimony was critical to his conviction." This claim arises out of circumstances that occurred in the presence of the jury during the direct examination of the state's witness, DeWitt-Smith. After DeWitt-Smith testified that the vic-tim had told him that the defendant was the "guy that robbed him," the officer said that he approached the defendant and "I explained to him, you know, I touched him, I said, 'Listen, I'm going to detain you for a while.

---

[5] In denying that he was the perpetrator of the crime involved, the defend-ant presented two witnesses. One was Bobiso, who was questioned about his identification of the defendant as the robber. The other was Rose McKin-ney, his girlfriend, who testified that the defendant was with her in her home at the time of the robbery.

[6] We decline to review this claim under the Connecticut constitution because the defendant has failed to provide an independent analysis of the claim under our state constitution. *State* v. *Webb*, 238 Conn. 389, 423 n.32, 680 A.2d 147 (1996); *State* v. *Daniels*, 42 Conn. App. 445, 454 n.8, 681 A.2d 337, cert. denied, 239 Conn. 928, 683 A.2d 397 (1996).

This guy [Bobiso] is claiming that you are the guy that robbed him.'" The state then asked: "Okay. And did you in fact detain him at that point?" DeWitt-Smith answered: "I patted him down for officer safety like we usually do and I placed him in the backseat of my patrol vehicle." The state asked: "All right. And at that point did you ask him his name?" The officer answered: "I—I asked him his name and asked him for some identification, yes." The state then asked: "Okay. And did he give you a name at that point?" The officer answered: "He gave me a name of Mark—I'm saying Freeman, but I'm really not sure exactly."

At that time, the following exchange occurred: "[Defense Counsel]: I'm going to object, Your Honor. First of all, there's no indication in any report that there was another name given and—

"The Court: Well, that's the problem with reports. They don't contain everything. That doesn't prohibit the testimony. You'll find out in fact of life as life goes on the police reports do not contain chapter and verse. They're not meant to. Now somehow we've escalated them into a biblical story and if it's not there then it's not part of the Bible. That's not the case. Now, this officer comes here and testifies in good faith what happened, I'll take it anytime over what a report says. I don't even know what report you have or who the author is.

"[Defense Counsel]: It's a report that the state's attorney gave me written by this gentleman.

"The Court: I don't care who gave it to you. I don't know who did. I don't care. Question. He gave the name you think at this time it could have been Freeman."

Immediately thereafter, the state continued with its direct examination of DeWitt-Smith. Defense counsel

did not object to the court's remarks and did not request a curative instruction.[7]

Because this claim of the denial of a fair trial was not preserved at the trial, the defendant now seeks review of it in this court under the *Golding* doctrine. See *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989); *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973). He argues that the trial court's remarks relating to a police officer's testimony violated his constitutional rights guaranteeing him the right to due process and a fair trial before an impartial judge and jury. In seeking *Golding* review, the defendant concedes that he failed to object to these remarks of the trial court and that he did not object "to the general jury charge regarding the 'credibility of a police officer.' "[8]

In *Golding*, the Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to

[7] The state also claims that defense counsel did not file a request to charge on the subject and failed to object to the court's jury instructions on police credibility.

[8] The trial court's final instructions to the jury included the following: "You had testimony here by two police officers and I tell you as a matter of law that a police officer's testimony is entitled to no special or exclusive sanctity merely because it comes from a police officer. A police officer who takes the witness stand subjects their testimony to the same examination and test that any other witness does. In the case of a police officer, you should not believe or disbelieve them merely because they are police officers. You should recall their demeanor on the stand, consider their training, if any, in the field in which they give evidence, their manner of testifying, the substance of their testimony, their capacity for observing facts and relating them to you accurately and truthfully. You should weigh and balance that testimony just as carefully as you would the testimony of any other witness."

demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant to the particular circumstances." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40; *State* v. *Romero*, 42 Conn. App. 555, 561, 681 A.2d 354 (1996).

In opposing *Golding* review, in addition to pointing out the failure of the defense to object and seek curative action at the trial court level, the state maintains that at a minimum the defendant has failed to demonstrate that the claim is of constitutional magnitude and that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial. Here, the record is adequate for review and the defendant has alleged a claim of constitutional magnitude, thus satisfying the first two prongs of *Golding*. Therefore, " '[w]e will examine the defendant's claim to determine whether the alleged constitutional violation clearly exists and whether it deprived the defendant of a fair trial. *State* v. *Torrence*, 196 Conn. 430, 435, 493 A. 2d 865 (1985).' *State* v. *Boyd*, 36 Conn. App. 516, 524, 651 A.2d 1313, cert. denied, 232 Conn. 912, 654 A.2d 356, cert. denied, 516 U.S. 828, 116 S. Ct. 98, 133 L. Ed. 2d 53 (1995)." *State* v. *Daniels*, 42 Conn. App. 445, 459, 681 A.2d 337 (1996).

" 'Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8; *Lisenba* v. *California*, 314 U.S. 219, 62 S. Ct. 280, 86 L. Ed. 166 [1941]; *Wojculewicz* v. *Cummings*, 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 [1958]. In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner

which approaches an "atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." *Glasser* v. *United States*, 315 U.S. 60, 82, 62 S. Ct. 457, 86 L. Ed. 680 [1942]; *Quercia* v. *United States*, 289 U.S. 466, 469, 53 S. Ct. 698, 77 L. Ed. 1321 [1933].' *State* v. *Echols*, 170 Conn. 11, 13, 364 A. 2d 225 (1975)." *State* v. *Gordon*, 197 Conn. 413, 424D–25, 504 A.2d 1020 (1985); see *Fair* v. *Warden*, 211 Conn. 398, 413, 559 A.2d 1094, cert. denied, 493 U.S. 981, 110 S. Ct. 512, 108 L. Ed. 2d 514 (1989): *State* v. *Johnson*, 28 Conn. App. 708, 720, 613 A.2d 1344 (1992), aff'd, 227 Conn. 534, 630 A.2d 1059 (1993). " 'The function of the court in a criminal trial is to conduct a fair and impartial proceeding. *Glasser* v. *United States,* [supra, 82].' *State* v. *Bember*, 183 Conn. 394, 401, 439 A.2d 387 (1981). 'The role of the [t]rial [j]udge is neither that of automaton nor advocate'; *People* v. *Yut Wai Tom*, 53 N.Y.2d 44, 56, 422 N.E.2d 556, 439 N.Y.S.2d 896 (1981); nor is a judge merely an 'umpire in a forensic encounter' but '[h]e is a minister of justice' and in 'whatever he does . . . the trial judge should be cautious and circumspect in his language and conduct.' . . . *Cameron* v. *Cameron*, 187 Conn. 163, 169, 444 A.2d 915 (1982); see *Quercia* v. *United States,* [supra, 466]; *State* v. *Gordon,* [supra, 425]." *State* v. *Fernandez*, 198 Conn. 1, 10–11, 501 A.2d 1195 (1985); see *State* v. *Smith*, 200 Conn. 544, 549, 512 A.2d 884 (1986); *State* v. *Delarosa*, 16 Conn. App. 18, 26–27, 547 A.2d 47 (1988).

Furthermore, "[d]ue process requires that there should be no [statement during the trial] that appears to reject a defendant's credibility and implies judicial support of a prosecution witness' testimony. . . . The influence of the trial judge on the jury is necessarily and properly of great weight; *Starr* v. *United States*, 153 U.S. 614, 626, [14 S. Ct. 919, 38 L. Ed. 841 (1894)]; and jurors are ever watchful of the words that fall from

him. See *Bollenbach* v. *United States*, 326 U.S. 607, 612, 66 S. Ct. 402, 90 L. Ed. 350 (1946). These admonitions and cautions are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended. *State* v. *Fernandez*, 198 Conn. 1, 12, 501 A.2d 1195 (1985)." (Internal quotation marks omitted.) *State* v. *Camerone*, 8 Conn. App. 317, 325, 513 A.2d 718 (1986). "The trial court should never assume a position of advocacy, real or apparent, in a case before it, and should avoid any displays of hostility or skepticism toward the defendant's case, or of approbation for the prosecution's." *State* v. *Smith*, supra, 200 Conn. 549. "A fine line separates proper and improper judicial conduct and the judge must strive to appear impartial and detached. See *State* v. *Fernandez*, supra, 198 Conn. 11; see also *State* v. *Camerone*, [supra, 325]." *State* v. *Floyd*, 10 Conn. App. 361, 369, 523 A.2d 1323, cert. denied, 203 Conn. 809, 525 A.2d 523, cert. denied, 484 U.S. 859, 108 L. Ct. 172, 98 L. Ed. 2d 126 (1987). Quoting *Commonwealth* v. *Myma*, 278 Pa. 505, 508, 123 A. 486 (1924), our Supreme Court stated: "The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table." (Internal quotation marks omitted.) *LaChase* v. *Sanders*, 142 Conn. 122, 125, 111 A.2d 690 (1955); see *Fair* v. *Warden*, supra, 211 Conn. 413–14; *State* v. *Echols*, supra, 170 Conn. 13–14. This court has said that "[j]udges in this state . . . are given wide latitude to comment fairly and reasonably upon evidence received at trial, but the court must refrain from making improper remarks which are indicative of favor or condemnation . . . . Even though a judge may take all reasonable steps necessary for the

orderly progress of the trial, he must always be cautious and circumspect in his language and conduct. . . ." (Citations omitted.) *State* v. *Hardwick*, 1 Conn. App. 609, 611, 475 A.2d 315, cert. denied, 193 Conn. 804, 476 A.2d 145 (1984).

In this case, we are not confronted with the propriety of the questioning of a witness by the trial court. See, e.g., *State* v. *Smith*, supra, 200 Conn. 546–47. Rather, we are confronted by a potently declarative statement by the trial court, delivered after an objection was placed by defense counsel to the answer of police officer Dewitt-Smith to a question posed by the prosecutor. It is that statement, as expressly articulated together with its fair implications, that the defendant argues, under the circumstances of this case, denied him his constitutional right to a fair trial. After a careful review of the record, including the trial transcript, we agree with the defendant. The "fine line" separating permissible and impermissible judicial conduct has been crossed. See *State* v. *Fernandez*, supra, 198 Conn. 17; see generally 1 C. McCormick, Evidence (4th Ed. 1992) § 8, pp. 23–28.

The state claims that while "it can be said that the court's comment was injudicious or improper, that does not mean that it transcended constitutional bounds." The state also posits that review should center on the context of the statement without the milieu of the entire case and we agree. The state argues that the defendant is incorrect when he "maintains that the trial court had instructed the jury to *believe* a police officer's testimony over the contents of a police report, because the testimony, in the judge's opinion, is given in good faith." (Emphasis in original.) The state, referring to this, argues that the trial judge "was simply expressing his own preference. [His] statement was a parenthetical

comment, not an instruction."[9] We disagree. Whether DeWitt-Smith was testifying in good faith was a factual determination to be made by the jury, not the court. The court's remarks trespassed on the jury's function. That the court, as the state says, was simply expressing its own preference compounds the intrusion on the function of the jury by imposing on it the court's preference for live testimony over police reports.[10] This language addressed to "good faith" and "preference" is declaratory, positive and delivered from the vantage point of authority.

Moreover, as the defendant also claims, the court's comments impermissibly bolstered the credibility of DeWitt-Smith in the eyes of the jury. See, e.g., *State* v. *Smith*, supra, 200 Conn. 550. One of the components of a right to a fair trial is the right to have issues of fact and credibility decided by the jury. *State* v. *Hines*, 187 Conn. 199, 210, 445 A.2d 314 (1982); *State* v. *Camerone*, supra, 8 Conn. App. 327. The tenor and plain content of the challenged comments, uninvited as they were, worked prejudicially on the defendant because they fairly conveyed to the jury the court's "own notion[s]" on matters solely within their province. See

[9] The state claims that defense counsel's cross-examination of DeWitt-Smith uncovered the fact that the officer's report contained no mention of the defendant's use of an alias and, thus, there was no issue concerning this officer's credibility with respect to his written report. This is hardly persuasive as the officer also said on cross-examination that, in such circumstances, he "usually" put in his report if an arrestee used another name (and also that he usually then arrests them for criminal impersonation). In addition, where he has, as here, access to the warrant that contains an alias, he puts that alias in. Here, the warrant did have the name "BIM" on it as an a/k/a (also known as) for Pharr. This evidence of the "other name" led to the trial court charging the jury, after a request to charge from the state, on the consideration by the jury of the consciousness of guilt on the part of the defendant if they found that he in fact gave DeWitt-Smith a false name at the time of his arrest.

[10] In the challenged comments, the trial court spoke of "police reports" in the plural.

*State* v. *Fernandez*, supra, 198 Conn. 16. Furthermore, this took place in a trial where the evidence, while sufficient for a finding of guilt, cannot fairly be termed "overwhelming." Cf. *State* v. *Mack*, 197 Conn. 629, 642, 500 A.2d 1303 (1985).

The trial court's comments, elevating the credibility of DeWitt-Smith, were not only unacceptably intrusive on the function of the jury, but also skewed an unfettered appraisal of that witness' testimony in a case where the evidence was hardly overwhelming. We do not agree with the state that the evidence against the defendant was "sufficiently strong that any inappropriate statement by the trial court constituted harmless error." The defendant at all times denied that he was the perpetrator. No gun was ever recovered. None of the money was ever recovered. The state is silent concerning Bobiso's inconsistent pretrial descriptions of the defendant as they were related at the trial. It should be underscored that it was DeWitt-Smith's testimony that prompted the trial court to include the consciousness of guilt charge. The defendant did not testify at the trial. The court instructed the jury that the law is that there can be a consciousness of guilt on the part of a person, who, when asked, gives a different name. The court told the jury to examine the evidence concerning the night DeWitt-Smith came upon the situation at the BP station "and his relationship, conversations back and forth with this accused." The court, saying that it is proper to show the conduct of an accused subsequent to a crime, charged, "The assumption of a false name [tends] to prove a consciousness of guilt; therefore, if you believe that the defendant gave a false name, that is a circumstance, which when considered together with all the facts in the case may justify an inference of the accused's guilt." Our Supreme Court has recently spoken[11] to the necessity of considering the

---

[11] In *State* v. *Jones*, 234 Conn. 324, 356–57, 662 A.2d 1199 (1996), the Supreme Court stated: "From the state of mind that we call 'guilty conscious-

prejudice of such evidence together with the inference asked to be drawn. In this case, DeWitt-Smith's testimony, the credibility of which had been bolstered by the trial court's comments, was the basis for the instruction on consciousness of guilt.

The state argues that *State* v. *Mack*, supra, 197 Conn. 629, is similar to this case. During the cross-examination of the arresting officer in that first degree robbery case, he was questioned about certain headgear worn by the defendant. The trial court injected that defense counsel was "leaving the impression that this officer was a pretty dumb officer, and that isn't fair." Id., 640–41 n.9. Thereafter, it also stated, "I have got a job to protect an officer who is trying to do the best he can when he is out of his element." Id. The Supreme Court also found that the trial court "did not assume the role of an advocate or otherwise abuse its discretion." Id., 641. In *Mack*, the Supreme Court said that while the comments were erroneous, they were not "sufficiently prejudicial to affect seriously the fairness of the trial so as to warrant a new trial." Id., 642. *Mack* is clearly distinguishable from this case not only because of the court's positive

ness' comes the inference that the actor committed the guilty deed. It is not this inference that has caused controversy. Rather it is the first step 'in the process of inferring the existence of that inner consciousness from the outward conduct, [in which] there is ample room for erroneous inference; and it is in this respect chiefly that caution becomes desirable and that judicial rulings upon specific kinds of conduct become necessary.' 2 J. Wigmore, Evidence (Chadbourn Rev. 1979) § 273, pp. 115–16.

"Conduct from which the state asks the jury to infer a guilty conscience 'is a species of evidence that should be viewed with caution; it should not be admitted mechanically.' *United States* v. *Hernandez-Bermudez*, 857 F.2d 50, 54 (1st Cir. 1988). Whether particular conduct is an index of guilt depends on the particular circumstances. *The probative value of the evidence of the defendant's conduct depends on the degree of confidence with which the inference can be drawn. United States* v. *Dillon*, 870 F.2d 1125, 1127 (6th Cir. 1989). *'Before evidence is allowed to be given, the court must also consider whether its prejudicial tendency outweighs its probative value.'* . . . *State* v. *Reid*, [193 Conn. 646, 655–56, 480 A.2d 463 (1984)]." (Emphasis added.)

declaration of good faith as to DeWitt-Smith's testimony and the court's preference of the primacy of oral testimony over that of a written police report, but also because of the overwhelming evidence of guilt in *Mack*. In that case, the evidence of guilt was "so overwhelming that any possible prejudice the defendant [might] have suffered from the court's remarks had no significant bearing on the verdict." Id. In *Mack*, the Supreme Court noted that the defendant was recognized by two of the victims' children as well as by the two victims themselves, all of whom had known the defendant long before the robbery. Id., 642–43. That is not so here.

Finally, the defendant claims that the court's unacceptable remarks and their prejudicial impact on the jury constituted a denial of the defendant's right to a fair trial. In doing do, he disagrees with the state's claim that the court's final instructions were curative and ameliorated any harm caused by the court's remarks. These instructions included the standard instruction on the credibility of a police officer and an instruction not to draw any inferences from any questions that the court may have asked any witnesses during the trial.[12] On the basis of our examination of the whole record, including the trial transcript, we cannot accept the

---

[12] The trial court charged as follows on the drawing of inferences from questions that it may have asked of witnesses: "Similarly, you should not draw any inferences whatever from any questions I may have asked any witnesses in this case. If I did, and I did, I gave no consideration to the answer given to any question which I may have asked. You have to examine the testimony of the witnesses who have been presented here before you. My inquiry of any witness is simply for clarification if I thought there was room for the witness to explain or clarify testimony that they gave for your benefit."

We note that the state appears to concede that "[w]hile this instruction was not tailored precisely to the court's remarks, it served to ameliorate any harm caused by the court's remarks." Actually, what is challenged by the defendant is not any question asked of any witness, but the definite and concrete assertion concerning the testimony of a police witness and the trial court's opinion concerning credibility.

state's claim that either or both instructions were curative of the court's remarks.

"[T]he jury is presumed, in the absence of an indication to the contrary, to have followed the instructions of the trial court. *State* v. *Moye*, 199 Conn. 389, 396, 507 A.2d 1001 (1986)." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 51, 671 A.2d 323 (1996); see *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). There are, nevertheless, occasions where the prejudice is so severe that curative instructions are unlikely to be effective. While it is impossible to determine precisely what effect the court's challenged comments had on the jury, the potential for harm is evident. Given the potency of the challenged comments, their determinative significance on the real issue in the trial, i.e., credibility, and their lack of real significance for any other purpose, the claimed "curative" instructions were quite unlikely to have prevented the jury from accepting and applying the court's earlier improper remarks. Moreover, that which is "curative" has been said to be that which is "intended to cure (that is, to obviate the ordinary legal effects or consequences of) defects, errors, omissions or irregularities." Black's Law Dictionary (6th Ed. 1990). The claimed curative instruction proscribing the jury from drawing any inferences from "any questions [the trial court] may have asked any witness," which it admittedly did, was directed to questions asked of any witness by the court. It was not directed to the challenged remarks, which were not questions to a witness, and was not intended to cure the judge's improper comments.

That leaves the standard instruction on the credibility of a police officer; it was correctly stated. The record before us does not show, however, any final instruction regarding any "curative" instruction to the challenged comments of the court. The comments were never withdrawn.

Our appellate courts have always given great weight to curative instructions in assessing claimed errors; see *State* v. *Fernandez,* supra, 198 Conn. 17; *State* v. *Drouin,* 12 Conn. App. 101, 105, 529 A.2d 740 (1987); especially in assessing a defendant's claim of prejudice. *State* v. *Smith,* supra, 200 Conn. 552; see *State* v. *Drouin,* supra, 101. Yet, our courts have also recognized that " 'a curative instruction is not inevitably sufficient to overcome . . . the impact of prejudice.' " *State* v. *Fernandez,* supra, 17; *State* v. *Tinsley,* 180 Conn. 167, 170, 429 A.2d 848 (1980); see *State* v. *Drouin,* supra, 105. A trial judge should be "cautious and circumspect" in his comments at the trial. *Fair* v. *Warden,* supra, 211 Conn. 414. Where that does not occur, however, a defendant is not entitled to a new trial unless he can show that prejudice resulted from the trial court's actions. Id.; see *State* v. *Echols,* supra, 170 Conn. 16. "In a jury case, such prejudice may be presumed absent mitigating circumstances." *Fair* v. *Warden,* supra, 414.

There were no mitigating circumstances in this case. Where "we are persuaded, as we are here, that the prejudicial impact of" improper trial court comments "has probably overborne reasonable juror conscientiousness," we must decline to accept the claimed efficacy of the claimed curative instructions. See *State* v. *Fernandez,* supra, 198 Conn. 17–18. This is one of those rare cases in which we are so persuaded. In speaking to the issue of "fair trial" the United States Court of Appeals for the Second Circuit has said, "The constitutional standard is fairness, not perfection. It is nonetheless, and rightfully, a high standard, for the court in a criminal case deals with the life and liberty of an individual. . . ." *United States* v. *Mendel,* 746 F.2d 155, 159 (2d Cir. 1984), cert. denied, 469 U.S. 1213, 105 S. Ct. 1184, 84 L. Ed. 2d 331 (1985).

## II

The defendant also claims that he was deprived of his constitutional right to a fair trial because the trial court abused its discretion by refusing to preclude extraneous, irrelevant and highly prejudicial evidence from the jury regarding his prior arrests. He also claims that the prejudicial tendency of such evidence outweighed its probative value and its harmfulness so significantly prejudiced the jury against him that it had a material and deleterious effect on the outcome of the trial and requires a new trial.

Although the defendant's claim is fairly based on an evidentiary ruling, making it incumbent on him to demonstrate the harmfulness of the error, he argues that the prejudicial impact of the trial court's ruling deprived him of his constitutional right to a fair trial. In making these claims, he maintains they arise somehow from the summary denial without a hearing of his motion in limine seeking that the "police officers [be prohibited] from referring to [his] prior arrests and convictions."[13] The defendant claims that Masek referred

---

[13] This motion in limine recited the following:

"Motion in Limine - Defendant Known to Police

"The defendant respectfully moves this court to enter an order prohibiting police officers who testify for the state in this matter from mentioning that the defendant was known to them through prior arrests and/or convictions. In support of said motion, defendant urges this court to adopt the rationale of the Connecticut Supreme Court as recently articulated in *State* v. *Talton*, 197 Conn. 280, 289 (1985), wherein the court, noting that in the case of a nontestifying defendant, the issue of the defendant's credibility not being properly before the jury, 'it was error to admit the [police officer's testimonial] evidence of the defendant's false statement with respect to his prior arrest record.' The defendant in the instant case submits that testimony from police officers to the effect that he was known to them through his prior acts is clearly analogous to the situation our Supreme Court found in *Talton*, in that such testimony unnecessarily prejudices the defendant and impugns his due process rights to a fair trial in contravention of his constitutional rights. U.S. Constitution, Amendments V, XIV; Connecticut Constitution, Article I, Section Eight. This Motion does not duplicate any previously filed or ruled on in this case."

to the prior arrests twice, once on the state's direct examination and once on his cross-examination. The trial court's actions concerning this matter, he contends, did not cure this error.

The state's position is that the defendant did not preserve this claim. We do not agree. The trial court had, early in the trial, denied the defendant's motion in limine. Moreover, the defendant did object to the reference on direct examination and, when it arose on cross-examination, he moved that it be stricken. Alternatively, the state maintains that the trial court ruled properly on this issue. The state further maintains that, even assuming without conceding that the court acted improperly, its ruling was "sanitized" by the trial court's curative instructions both during the trial itself and in its final instructions to the jury. We agree with the state.

"The general rule is that evidence of the commission of other crimes or specific acts of misconduct is inadmissible to prove that a defendant is guilty of the crime charged against him. . . ." (Citations omitted.) *State* v. *Talton,* 197 Conn. 280, 289, 497 A.2d 35 (1985); see 1 F. Wharton, Criminal Evidence (14th Ed. Torcia 1985) § 178. "The rule of admission of evidence of other crimes is a rule of evidence and not a rule of constitutional law. . . . Generally, however, the admissibility of evidence is a matter of state law and unless there is a resulting denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved. *United States ex rel. Bibbs* v. *Twomey* [506 F.2d 1220, 1222 (7th Cir. 1974)]; *Grundler* v. *North Carolina,* 283 F.2d 798, 802 (4th Cir. 1960)." (Citations omitted.) *State* v. *Periere,* 186 Conn. 599, 610–11, 442 A.2d 1345 (1982); see *State* v. *Walker,* 215 Conn. 1, 5, 574 A.2d 188 (1990); *State* v. *Vilalastra,* 207 Conn. 35, 46, 540 A.2d 42 (1988). Where the denial of a constitutional right is claimed, "[t]he test for determining whether a

defendant's constitutional right to a fundamentally fair trial has been violated by the admission of evidence of other crimes is the same as would be applied by a reviewing court on direct appeal in determining whether the admission of such evidence was within the permissible exercise of discretion of the trial court." *United States ex rel. Bibbs* v. *Twomey*, supra, 1223; *United States ex rel. Harris* v. *Illinois*, [457 F.2d 191, 198 (7th Cir. 1972)]." *State* v. *Periere*, supra, 611. " 'When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error. *State* v. *Ruth*, 181 Conn. 187, 196–97, 435 A.2d 3 (1980). The defendant must show that it is more probable than not that the erroneous action of the court affected the result. Id.; *State* v. *McClain*, 171 Conn. 293, 300, 370 A.2d 928 (1976).' *State* v. *Jones*, 205 Conn. 723, 732, 535 A.2d 808 (1988)." (Internal quotation marks omitted.) *State* v. *Vilalastra*, supra, 47.

We first take up the defendant's claim that the trial court summarily denied his motion in limine without a hearing. After granting the defendant's motion for sequestration, the defendant presented his motion in limine asking that the trial court prohibit police officers called by the state from mentioning that the defendant was known to them through prior arrests or convictions. During the colloquy on that motion, the trial court said: "I don't know how that would come up. I don't need a motion in limine for that. You just interpose an objection. The state won't ask a question like that. How am I going to monitor that?" After defense counsel answered, "By instructing the police officer," the trial court said, "Sorry, motion denied. File your objection. Make it when it comes up."

We do not agree that this motion was "summarily denied" without a hearing. The motion itself is self-explanatory and is not novel. A trial court may "enter-

tain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence. . . . The judicial authority may grant the relief sought in the motion or such other relief as it may deem appropriate, may deny the motion with or without prejudice to its later renewal, or may reserve decision thereon until a later time in the proceeding." Practice Book § 850B. This court has said that "[t]he motion in limine . . . has generally been used in Connecticut courts to invoke a trial judge's inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial." *Richmond* v. *Longo*, 27 Conn. App. 30, 36, 604 A.2d 374, cert. denied, 222 Conn. 902, 606 A.2d 1328 (1992). *Richmond* also instructs that "[w]hen the determination of the admissibility of evidence hinges on other necessary facts that can properly be determined only during the trial after the necessary prerequisite testimony has been presented, such determination is more appropriately made after such prerequisite testimony has been presented." Id. Here, the trial court heard and acted appropriately by telling counsel to object if the matter came up. Practically speaking, it also recognized that the state would not ask a question "like that." To be sure, the hearing was brief, but we do not agree that it was "summarily denied."

Thereafter, during the trial, the state asked Masek the following question concerning his interview of the victim Bobiso at the Bridgeport detective bureau: "Now, as part of your procedure of taking a statement to find out what happened, did you also employ any measures to try to identify the person that he claimed had robbed the gas station?" Masek responded, in the presence of the jury: "Yes. Based on the victim's description of the suspect being a black male we have a photo array books consisting of several pages of black males that have

been arrested prior by our department and we showed him these books—

"[Assistant State's Attorney]: All right. Hang on for just one second. Your Honor—

"[Defense Counsel]: I'm going to object, Your Honor.

"[Assistant State's Attorney]:—getting into the subject of a motion, Your Honor, by counsel. I don't want to—

"The Court: Do you want to take that up now?

"[Defense Counsel]: Yes, I do, sir."

The trial court, without any comment about Masek's prior arrest testimony, then excused the jury for the day. The defendant's counsel addressed the court and the following took place:

"[Defense Counsel]: Well, there's several motions regarding this. The first would be the motion that I—

"The Court: Just address whatever one you want.

"[Defense Counsel]: The motion in limine regarding any police reference, since this gentleman is known by the police, any police reference to prior arrests, prior convictions, etc., and that's why I asked Your Honor to consider it before because I knew that it would come out regarding the information so I would ask the court that this is highly prejudicial to my client, any reference. He hasn't taken the stand, he's not to be—

"The Court: I think I denied that.

"[Defense Counsel]: Pardon me?

"The Court: I denied that motion earlier on. You addressed the motion in limine to me today.

"[Defense Counsel]: That's correct and you indicated to me that you would consider. You denied it for the time being.

"The Court: I denied it, period. I said you make your objections when you hear it. Now, you made no objection when the police officer arriving in the gas station told the arresting officer who was detaining him on the accusation by the victim that he said, that's not Freedman. He says that's Pharr. We know who he is. How did they know? I don't worry about those things. The jury will not convict him based on his prior history. They'll only do it on this case. I'll take care of that during the charge. Now, I didn't delay that whatsoever. I denied it. The record will stand on that."

The next portion of Masek's testimony on the prior arrest claim came up on the following day during the defendant's recross-examination. After defense counsel had asked Masek about the description of the robber that the victim had given him at the Bridgeport detective bureau, the following took place:

"[Defense Counsel]: And other than this, did you ever come across any other information containing reference to Bennie Pharr's height and weight?

"[Masek]: Yes, I did.

"Q. And off the top of your head, can you tell us where it came from and what it was?

"A. Yes, it came from the National Crime Information Computer which is information that's compiled at the time of a previous arrest, and—

"[Defense Counsel]: I'm going to object to that, Your Honor, and have it stricken. I just asked him to—

"The Court: You asked him where he got it.

"[Defense Counsel]: And I would ask that it would be stricken—the previous arrest.

"The Court: Well, in the interest of fairness, probably, I'm going to do it, but the question is certainly responsive—the answer is responsive to the question.

"[Defense Counsel]: Under *State* v. *Talton*, I would ask the court to—

"The Court: *State* v. what?

"[Defense Counsel]: *Talton*. I would ask that it be—the defendant is not on the stand here.

"[Assistant State's Attorney]: Your Honor, I think that my request will be that the jury be cautioned as opposed to stricken. It's the evidence that we—"

At that point the trial court then addressed the jury: "I think the answer's responsive, but I also will tell you during my instructions on the case that this case is this case. This case and the facts of this case. And that you will not, under any circumstances, consider any other suspicion that you may have from the fact that he may or may not have been arrested in the past, either by way of this answer which counsel has asked, or by way of the fact that the reference to any photographs may be sometimes used and characterized as mug shots. Now, whether that means a person's been arrested or not has not judicially been determined. I don't know that answer, because there are many sources for photographs in a police identification book, many. And I can't jump to the conclusion because your picture's there that you have been arrested or charged or convicted of a crime. Okay, so I want you to put those two things aside. The mug shot, the characterization—it's a TV word that's become popular and, secondly, the fact that he was listed in the National Crime Index—we don't know what it's about; we're not going to retry that case and we're not going to give him a negative impact because of that statement, but it's a fact in the case because it was asked, where did you get this information? Fair enough. Just be careful of that. Try this case on the facts of this case, and I'll talk to you about it later."

During the course of its final instructions, the trial court underscored its earlier curative charge with a stronger curative instruction when it charged: "Counsel asked [Detective Masek] his source of the information as to his height and his weight and he answered that question. That's a fair question; that's a fair answer he gave. When he said he obtained it from a national something—index—computer index, which may give you reason to think that they said that information in a national computer system which is commonly maintained by all departments which would reflect that this [person] on trial had come to the attention of the authorities on a prior occasion. I say to you in regard to that, caution, and a mandatory one. Put that out of your mind. The officer answered the question that was asked him. Would it have been better if he didn't or you didn't become aware of that? Certainly. So, I'm telling you to affirmatively, positively, remove that from the consideration in this case. Decide this case based on what happened at 5:05 a.m. on May 13, 1995, at the corner of State and Park. You decide this case."

Applying the relevant principles to the circumstances set out previously, we conclude that the defendant "has put a constitutional tag on a nonconstitutional evidentiary ruling." (Internal quotation marks omitted.) *State* v. *Walker*, supra, 215 Conn. 5; *State* v. *Douglas*, 205 Conn. 445, 455, 525 A.2d 101 (1987). While we believe that the trial court should have acted immediately to caution the jury after Masek's direct testimony as to the defendant's prior arrests, that omission was not one of constitutional magnitude nor any denial of fundamental fairness. See *State* v. *Walker*, supra, 5. We further determine that the defendant has not sustained his burden of demonstrating the harmfulness of the court's action, specifically that it was more probable than not that that action affected the result.

The defendant relies on *State* v. *Ferrone*, 97 Conn. 258, 265, 116 A. 336 (1922), in which our Supreme Court held that the defendant was denied a fair trial because a police officer testified that the defendant, during a custodial interrogation, said that he had never been arrested when, in fact, he had just spent "seven years in Sing Sing." In *Ferrone*, the court reasoned that this evidence "was obviously intended for the purpose of picturing the accused as a notorious criminal"; id., 267; thereby prejudicing the jury against him.

The case at bar is not *Ferrone*. Here, the jury was exposed only to a reference that the victim picked out the defendant's photograph from some "photo array books consisting of several pages of black males that have been arrested prior by our department." There was no indication of whether there had been more than one prior arrest, no indication of any conviction, no indication of the charge or charges involved or any of the underlying facts. Moreover, the second time the prior arrest matter arose was during the defendant's recross-examination of Masek when the defendant, not the state, attempting to find out where Masek got information about the defendant's height and weight other than from the victim, asked Masek: "And off the top of your head, can you tell us where it came from and what it was?" Masek answered: "Yes, it came from the National Crime Information Computer which is information that's compiled at the time of a previous arrest . . . ." At that time, the trial court appropriately cautioned the jury. Later, during its final instructions, the trial court, at length, carefully admonished the jury on this fact of the trial. The defendant has no complaint on this issue.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.